# Richmond

## Leonard E. Davis v. Commonwealth of Virginia.

November 24, 1947.

Record No. 3295.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*J. M. Turner* and *M. J. Fulton*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *Ballard Baker*, for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

On November 4, 1946, in the Hustings Court of the City of Richmond, Leonard E. Davis and Carl R. Burleson

were separately indicted, each charged with having committed the crime of rape, on October 20, 1946, upon Nannie Strayhorn, a female of the Negro race, 32 years of age.

Burleson, a white man, 27 years of age, weighing about 180 pounds, was a member of the regular police force of the city of Richmond. Davis, a white man, 43 years of age, described as being stout, was an auxiliary member of the same police force.

Nannie Strayhorn was a married woman, and the mother of two boys, 11 and 13 years of age. Her weight is about 135 pounds. She has lived apart from her husband for seven years, who, at the time of the instance hereinafter related, was an inmate of the State penitentiary.

When arraigned upon the indictments, the accused men, represented by counsel of their own choosing, pleaded not guilty. By consent, given in person by each, they were tried jointly. Each was found guilty by a jury in separate verdicts, and the punishment of each fixed at seven years in the penitentiary. Both of the accused moved the court to set aside the verdicts as contrary to the law and the evidence, and for misdirection of the jury.

On March 21, 1947, the motion of the defendant, Davis, was overruled, and judgment was pronounced against him according to the verdict of the jury. From this judgment he has appealed.

Davis contends that the judgment against him should be set aside on the grounds, first, that the verdict of the jury was contrary to the law and the evidence, viz., for want of evidence to convict, and for lack of credible evidence; second, for error in the admission and refusal of certain evidence; third, for error in the granting and refusing of instructions; and, fourth, that the jury ignored the instructions of the court.

The evidence for the Commonwealth is as follows:

On the night of October 19-20, 1946, Mrs. Strayhorn was attending a party at the home of a colored friend, Mrs. Rosa Lee Page, on Leigh street, in the city of Richmond.

Included in the company present was a colored man, Francis Hatchett. Mixed drinks of a mild alcoholic nature were served. About 2:30 a. m., on October 20th, Mrs. Strayhorn indicated her desire to return to her home five or six blocks distant. Hatchett, whom she had known for a short period, offered to drive her to her home in his automobile. She accepted, and they left together. Hatchett drove out Chamberlayne avenue, expressing his desire to go to a resort called the Market Inn for sandwiches. Mrs. Strayhorn did not care to go, and protesting, she made a move to open the door and get out of the moving car. Hatchett slowed down the car, and she jumped out and began to walk fast or run toward her home. Hatchett drove to the curb, stopped his car, got out, chased her, and caught up with her in a short distance, taking hold of her arm. At this particular moment, about 2:45 a. m., while they were discussing the proposed trip to Market Inn, a police car came up. Officer Carl R. Burleson, in full police uniform and armed equipment, got out of the police car and went up to the couple. The police car, with Davis driving, pulled over to the curb a short distance away, facing north on Chamberlayne avenue. Burleson, after talking with Mrs. Strayhorn and Hatchett, and being told that there was no difference between the parties, except that Mrs. Strayhorn wanted to go home, and that Hatchett wanted to take her to Market Inn, told Mrs. Strayhorn to get into the back seat of the police car. After a further questioning about his driving permit, Hatchett was ordered to go to his home. Burleson then returned to the police car, and got in the back seat with Mrs. Strayhorn, telling her that she could be charged with being a person of ill fame. She was, however, never put under arrest. Davis then drove the police car north on Chamberlayne avenue to a spot back of a new development, known as Brookfield Gardens, a secluded and deserted area within the city limits. Hatchett, in his own automobile, undertook to follow the police car, but lost it after it had turned several corners.

In the deserted area back of Chamberlayne avenue, Mrs. Strayhorn said that Burleson had sexual intercourse with her against her will, and that immediately thereafter Davis likewise committed the same offense.

Inasmuch as the conviction of the accused rests largely upon the testimony of the prosecutrix, it is necessary to recite a portion of the sordid details of her testimony, showing the sequence of events from the moment the police car arrived on Chamberlayne avenue, and the police officers first met Mrs. Strayhorn.

Mrs. Strayhorn said, when first ordered into the police car:

"They said they would take me. It was just two blocks from home and they put me in the back seat and he told the driver to go north. They told me to shut up if I knew what was good for me and they continued to drive and I begged and pleaded and prayed for them to let me go home. I had nothing but my bag with my powder puff and handkerchief."

She was then asked what happened after the police car had parked on the isolated road back of Brookfield Gardens, and answered:

"When they drove up and turned the car in this place the driver in front steps out and the one in the back seat pushed me back, and I said, 'Please don't you do this to me. I am a respectable married woman with two children and a hard-working woman.' And he said 'Shut up' and started pulling at me. I said, 'Don't please do this to me, please God be with me.' I didn't have nobody to call on but the Lord and he continued on. I was holding my legs together and he takes my underwear off and he said, 'Shut up if you know what's good for you.' Then he continued with what he had to do and then he steps out of the car.

"Did he pry your legs open?

"A. Yes, with his knee. I was holding my legs together, praying, but he prized my legs open and he said, 'Hold your legs up, girl.'

\* \* \*

"Q. Did he have on the usual regalia worn by police officers?

"A. Yes.

\* \* \*

". After Officer Burleson had accomplished his purpose what happened then?

"A. He stepped out the car and then this other officer stepped in.

"Q. Did he step in immediately?

"A. Immediately. He pushed me back and I started crying and praying again. He told me to shut up. I was trying to push myself back up, and he did the same thing.

"Q. He had sexual intercourse with you under those conditions?

"A. Yes.

She further said:

"Q. \* \* \* You have said that each of the officers was constantly telling you to shut up, or this praying, hollering and crying, if you knew what was good for you. What effect, if any, did their constantly telling you to shut up have on you?

"A. I thought they were going to hurt me, do me some bodily harm.

"Q. If it had not been for your impression that they were going to hurt you, would you have allowed them to have intercourse with you?

"A. Certainly not."

On cross-examination, she testified:

"Q. When Mr. Davis got out Mr. Burleson didn't get out? Mr. Davis just got out and Mr. Burleson pushed you back?

"A. Yes.

"Q. And pulled your clothes up and you were praying?

"A. Praying and crying, 'Please let me go because I am a decent hard-working woman and a mother of two children.'

"Q. And you were on the back seat?

"A. Yes.

"Q. How did you arrange yourself?

"A. I didn't.

"Q. How did he arrange you?

"A. He pushed me back this way (indicating).

"Q. How were your feet lying?

"A. On the floor, but when anybody pushes you your feet are going up.

"Q. He pushed your clothes up and pulled your pants off?

"A. He pushed me back—yes, he did.

"Q. What kind of panties were you wearing?

"A. Elastic.

"Q. Did you raise your legs up?

"A. No.

"Q. How did he get them off?

"A. He slipped them off.

"Q. Did he raise your feet up?

"A. That's the only way he could get them off.

"Q. Did you raise your feet up?

"A. I couldn't get out. He pushed me back and he raised my feet up.

"Q. Did he put them down again?

"A. I was screaming with him, pleading with him, trying to defend myself.

"Q. What did you do to defend yourself?

"A. I couldn't do anything. I was scared.

"Q. You were sitting down, he pushed you back and your feet were on the floor and he reached down and pulled your feet up?

"A. He pulled my clothes up and I said, 'Don't please, please don't do this to me. I am a respectable married woman. Don't do this. I am taking you for my protection, Lord have mercy, don't let him hurt me.' Yes, he pulled them down and I was holding my legs down.

"Q. After he raised your feet up what did he do?

"A. He pulled them up and he pulled them off.

"Q. Did you put your feet down?

* * *

"Q. When he raised your feet up did you try to kick him?

"A. I was kicking my legs and he told me to shut up and let him alone, and I thought he was going to hit me with the black jack.

"Q. But he didn't make any effort, you just thought that?

"A. The way he pushed me back I knew if he was that cruel to knock me and push me he was cruel enough to do anything.

"Q. What were you doing with your hands?

"A. Pushing at him.

"Q. Did you try to scratch him?

"A. I haven't got anything to scratch with; my nails are short.

"Q. Did you try to hit him?

"A. I don't know what I was trying to do. I was so upset and hysterical, I don't know what I was doing.

"Q. Did you try to kick him?

"A. I don't know what I was trying to do.

"Q. Just tell me exactly what Davis did when he got in the car with you.

"A. He stepped in the car and he pushed me back and I told him to please, please don't do this to me. I kept on praying and he said they were going to take me home. That's what he was saying and he pushed me back and almost fell on top of me and as heavy as he was he certainly would have hurt me.

"Q. How did he get your legs open?

"A. The same way.

"Q. How?

"A. He prised them.

"Q. All the resistance you put up was asking them not to do that to you?

"A. I was afraid. One was armed and could have hurt me and I know the way they were acting they would have hurt me.

"Q. Can you tell what kind of arms Davis had?

"A. I can't tell.

"Q. Did you ask Mr. Davis to tell Mr. Burleson not to do anything?

"A. No. I asked them to please, please don't do this to me. I begged and I begged, please, please. That's all I could do, beg and plead and pray. I don't know anything about fighting. I have never been in a fight or any trouble in my life. I try to live a good, clean, respectable life and be a good mother to my children. That's all I can do.

"Q. Did you call anybody at all when they were carrying you away?

"A. Yes, I was crying.

"Q. Did you holler?

"A. I was crying as loud as I could and they told me to shut up all that noise.

"Q. Was that on Chamberlayne Avenue?

"A. Yes.".

After the above acts were committed, the police officers drove her back to Chamberlayne avenue, and put her out of the car about four blocks from her home. She ran home and, finding her brother up, told him about the incident. She was crying and disturbed and it took him about one-half an hour to calm her down. It was then about 4:00 o'clock a. m., and her brother advised her to get some rest. She cleaned herself, taking some sanitary precautions, and a dose of aspirin, and went to bed. The next morning about 9:00 o'clock she called her friend, Mrs. Page, and told her of the incident. Also on the same morning, Sunday, she called on attorney at law to her house, and told him what had happened. Upon the advice of her attorney, the chief of police was notified on the following Monday.

After receiving the complaint of Mrs. Strayhorn, the chief of police directed an investigation. On October 21,

at 4:00 p. m., in the police station eight officers on the night force were lined up. Mrs. Strayhorn was asked to walk down the aisle and see if it contained her attackers. She did so and without hesitation immediately identified Officer Burleson as the man who first raped her. Francis Hatchett, in a similar proceeding, also identified Burleson as being present on the night and place in question. Davis was not in the line up. Mrs. Strayhorn thought that a man in the line resembled Davis. She was not positive, however, and said only that he was similar in build and size to Davis.

Burleson was told what he was accused of and was asked to relate his actions on the night of October 19-20. He told about three arrests and said he had never seen the prosecutrix before. A warrant was then sworn out against him and a car was sent to bring Davis from his home to the police station. It had been ascertained that Davis, as an auxiliary officer, had been assigned to duty with Burleson on the night mentioned. In the meantime, Burleson was again questioned and he positively denied that he had ever seen the woman and picked her up in his car. Davis was brought in and separated from Burleson. He was asked to relate his actions on the night. He reported several things, but did not say anything about meeting Mrs. Strayhorn. He was then asked the direct question about meeting a man and a woman in an argument and he admitted that a woman was, on that night, put in the police car and carried to her home. Burleson, then warned of the statement by Davis, said he remembered the woman and that he had put her in his car and taken her home. Davis explained that he thought the matter so trivial it slipped his memory. Burleson said that he had said nothing about the matter because he was afraid he had neglected his duty in letting Hatchett loose, Hatchett having been later arrested for drunken driving that night.

Each of the officers denied sexual intercourse with the prosecutrix. They said they told her not to get in the police car but that she did so regardless; that the car was then turned around and headed toward her home and when

they got near her home, Burleson asked about turning her loose and Davis said, "Yes, give her a break," and that she then got out of the car and thanked them for being nice to her and went on up the street.

Rape is the unlawful carnal knowledge of a woman by force and against her will. Virginia Code, 1942 (Michie), section 4414; *Mings* v. *Commonwealth*, 85 Va. 638, 8 S. E. 474; *Pittman* v. *Commonwealth*, 179 Va. 477, 19 S. E. (2d) 672.

We have repeatedly held that a conviction of rape may be sustained upon the uncorroborated testimony of the prosecutrix, if it is not incredible and contrary to human experience, and if the guilt of the accused is believed by the jury beyond a reasonable doubt. *Stump* v. *Commonwealth*, 137 Va. 804, 119 S. E. 72; *Addington* v. *Commonwealth*, 161 Va. 975, 170 S. E. 565.

The principal question presented is whether the alleged act was against the will of the prosecutrix and by force. Under the law two types of force, active and constructive, are recognized. To constitute a crime there must be some array or show of force in form sufficient to overcome resistance, but the woman is not required to resist to the utmost of her physical strength, if she reasonably believes resistance would be useless and result in serious bodily injury to her. *Jordan* v. *Commonwealth*, 169 Va. 898, 194 S. E. 719, and cases cited.

In *Mings* v. *Commonwealth, supra,* it is said:

"The crime, however, really consists in the ravishment of a woman without her consent; and the question, therefore, always is, was the woman willing or unwilling? And if it appear that carnal intercourse was effected with her without her consent, the crime of rape is proved, although no positive resistance of the will be shown. Or, as Bishop expresses it, 'wherever there is a carnal connection without anything which can be deemed a consent—where there is neither a consent fraudulently procured, nor any other sort of consent—by the woman, there is evidently, in the wrong-

ful act itself, all the force which the law demands as an element of the crime.' 2 Bish. Crim. Law, sec. 1078."

The following instruction governing the use and extent of force was given by the trial court:

"The court instructs the jury that while the element of force is an essential element in the crime of rape, and while you must believe that the force used was sufficient to overcome the will of the prosecutrix, yet if you believe that the mind and will of the female were overpowered by fear induced by the man, and therefore she made less resistance than she may otherwise have been capable of making, it is rape nevertheless. In this connection, you may consider the time, the place, and relative physical strength and endurance of the prosecutrix and the accused, the whole situation as it confronted her, and all of the circumstances disclosed by the evidence."

■ This instruction is identical with the instruction approved in *Gray v. Commonwealth*, 184 Va. 236, 35 S. E. (2d) 65, and submits a rule which is in accord with the weight of authority.

In 52 C. J. page 1019, this is said:

"The female need not resist as long as either strength endures or consciousness continues. Rather the resistance must be proportioned to the outrage; and the amount of resistance required necessarily depends on the circumstances, such as the relative strength of the parties, the age and condition of the female, the uselessness of the resistance, and the degree of force manifested, * * * ."

Davis denies that he had carnal intercourse with the prosecutrix. He claims that the evidence of the manner of the commission of that act is incredible, and not sufficient to show his guilt beyond a reasonable doubt. He further contends that if he had such intercourse, the evidence fails to show that Mrs. Strayhorn was raped by him by force, either actual or constructive.

He claims that the evidence of the prosecutrix was incredible and unworthy of belief because she was unable to locate the exact spot where the crime was committed, or

give the specific hour of its commission; because her clothes were not torn or her person bruised, and because the act could not have been committed in the rear of the car in the manner described by the prosecutrix.

Definite and specific details of each and every circumstance surrounding an act of the character here described are not always to be expected. The natural fright, emotion, and excitement attendant upon such an attack and the desire to escape bodily injuries render the mind unreceptive to all matters, save the most pressing. However, Mrs. Strayhorn was able to specify the general location of the act and to approximate the time fairly closely.

Torn clothes and bodily bruises are often evidence of force, but such evidence is not always present in the crime of rape. *Gray v. Commonwealth, supra.* Force may be active or constructive. Whether or not garments be torn and bruises inflicted may depend upon several facts,—the quality of the garment and the nature and character of the force involved. Whether there be sufficient force in any case depends upon the surrounding circumstances and the conditions existing at the time.

Mrs. Strayhorn did not describe the exact position she occupied when she was raped, but she was not asked to do so. She did say that she had to "lay back" in an "awful strained" position, and that Davis pushed her back and almost "fell on top of her." The jury had all of these facts and the additional circumstances before them, and however difficult it may have been to commit the offense on the back seat of the car, they had evidence that it was committed in that position. The question of the credibility of the prosecutrix was one for the jury to settle.

Mrs. Strayhorn's conduct after the attack was that of an outraged woman. Her testimony was not shaken under a vigorous cross-examination. There was no reason shown why she should tell a false story against the defendant and involve herself in an unpleasant situation. Except for the night of October 19-20, there were never any dealings between Davis and Mrs. Strayhorn.

On the other hand, the failure of the officers to report the incident of their meeting with Mrs. Strayhorn and Hatchett on the night in question, and the denial of Burleson that he had ever before seen the woman until he was confronted with the amended statement of Davis, are not satisfactorily explained; and are indicative of a withholding of facts on the part of the officers.

The evidence of the Commonwealth shows that two police officers met a colored woman on the street at 3:00 a. m., and directed her to enter their automobile. One of the officers was armed and both were strong, stout men. Instead of taking her to her home, they drove to an isolated spot and parked, despite her cries and pleading. They told her to shut up "if you know what is good for you." After they parked each had sexual intercourse with her without her consent. The woman's cries brought no help; her pleadings were unavailing. The evidence recited shows that there were both a show of force and threats which indicated the intention to use force if necessary. The motive in carrying the prosecutrix alone to an isolated spot was obvious. She was completely in the power of the officers. The threats and show of force were calculated to cause her reasonably to believe that they would do her serious bodily harm if she resisted them by such physical force as she possessed. The evidence thus meets all the requriements of unlawful sexual intercourse against the will and by force, all that is necessary to constitute the crime of rape against an adult female.

The jury was fully and correctly instructed, and there was sufficient evidence to justify the instructions. There was no error in refusing instruction J offered by the defendant. It picked out one certain fact to the exclusion of the others and is argumentative. The subject matter of the other instructions refused was covered by instructions given.

We find no error in the rulings on the evidence offered. On the conflicts of evidence and on the measure of force used by the accused to accomplish his purpose, we follow

the verdict of the jury and the judgment of the able and experienced trial judge, who saw and heard the witnesses testify. We find no error in the judgment.

*Affirmed.*