Pleasant D. **FARRAR**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 15223.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 2, 1959.

Decided Dec. 11, 1959.

Petition for Rehearing In Banc Denied
Feb. 16, 1960.

Opinion Amended Feb. 18, 1960.

Mr. John E. Nolan, Jr., (appointed by this court), Washington, D. C., for appellant.

Mr. Harold H. Titus, Jr., Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before EDGERTON, WILBUR K. MILLER and FAHY, Circuit Judges.

EDGERTON, Circuit Judge.

Appellant, charged with rape, waived a jury trial and was convicted by a judge.

The complaining witness was an 18-year old girl to whom intercourse was not a new experience. Late at night appellant, a stranger to the girl, accosted her in a street, and they walked together two or three blocks to his room. They undressed and had intercourse. About 45 minutes later they had intercourse again. During the interval, he left the room and brought her a drink of water at her request and poured some whiskey. Finally she partly dressed, went to a bathroom, "turned both spigots on", left the building, went to a fire station, and said she had been raped. Police were called and took her back to appellant's room. He at first said he did not know her, but presently admitted he had intercourse with her. So much is undisputed.

The girl testified at appellant's trial that she walked with him to his room, and undressed, because he threatened to kill her if she refused to do so. But she did not testify that her taking part in intercourse was induced by those threats, or by words of any sort. She testified to the contrary. When she was asked, "how did you happen to have this second intercourse with Mr. Farrar?", she replied: "He made me have the second the same as the first. Q. What did he say to you? A. He didn't say anything. Every time he got ready to have inter-

course with me, he put the knife around my neck."

She testified that he had a knife in his hand, and constantly pressed it against her, all the time they were walking together through the streets, through the door into the house, and upstairs to his room,[1] and that he had it in his hand much of the time she was in his room.[2] Yet she repeatedly testified that she never saw it.[3] There were lights in the streets. There was a light in the room. The girl's eyes were not closed and she was "looking at him." Neither the girl nor her clothing was marked by a knife. The police promptly searched the room. No knife was ever found.

It is nearly or quite incredible that appellant could have used a knife as extensively as the girl said he did without her ever seeing it. It is so nearly incredible that a reasonable inference, if not the only reasonable inference, from the testimony of the girl herself, is that appellant did *not* use a knife. And there is no evidence that her participation in

intercourse was induced by any other kind of force or threat.

She afterwards accepted $15 from a girl friend of appellant. She gave a receipt, in her own handwriting, which was produced in court. On the witness stand, she admitted that she wrote the receipt but denied that she got the money.

The appellant testified that he never threatened the girl, with a knife or otherwise;[4] that he promised to pay her; that they had intercourse with her consent; and that he did not pay her. He said: "I didn't give her anything; I promised it to her." The girl testified more than once that he promised to pay her: "He said he would give me some money. * * He said he would give me anything, anything I wanted. Those were the words he used." She did not testify that he kept his promise.

■■ The theory of the defense is that she became angry because he broke his promise and that she therefore accused him of rape. In the light of all the conflicting evidence, this hypothesis

---

1. "So after we got inside the door, he walked me up the stairs to the second floor. * * *

"Q. At the time you got up to the door, were you aware of this sharp instrument? A. Yes, he had it.

"The Court: How do you know he had it?

"The Witness: Because he kept it there (indicating).

"The Court: During this walk along the street?

"The Witness: And up to the door, yes.

"By Mr. Stevas: Q. Is this while you were at the main door of the building? A. Yes, and also until we got to his room.

"Q. Where was the room you went to? A. It was up on the second floor * *."

2. E. g., when he told her to take her clothes off; "Was he still standing there with his knife around your neck? A. He had it in his left hand.

"Q. And you say you didn't see it? A. I wasn't trying to see it. * * * When I was sitting on the bed, he put the knife to my neck, like around like that (indicating). I think it was a knife; I didn't turn around to see what it was.

"Q. After you stood up, what happened? A. He told me to pull off my clothes. "Q. What did he do? Was he doing anything? A. He stood up there with the knife in his hand."

3. E. g., "The Court: Did you ever see, not feel—Did you ever see what you thought was a knife or any kind of sharp instrument at any time while you were with the defendant?

"The Witness: I will tell you the truth, I never did see it but I felt it."

4. Irma Smith, a policewoman, testified that appellant told the police he "asked [the girl] to take her clothes off and to get into bed" and that he "said at that time he might have held the knife against her neck." But Policeman Machie denied that appellant made such a statement: "The Court: He did not say he might have held a knife to her; he told you he might have said he might cut her if she didn't go with him; is that right? The Witness: Those were his words * *." Appellant denied both accounts of what he said to the police. He testified: "The officer asked me what did I say. The secretary was taking down what he asked me more or less and I said I didn't say that, and she still took it down."

seems to us at least as likely as any. With deference to those who think otherwise, we are obliged to say that in our opinion it cannot reasonably be regarded as proved beyond a reasonable doubt that the appellant was guilty of rape. "We must reverse a criminal conviction when it is 'clear to us that upon the evidence * * * a reasonable mind must necessarily have had a reasonable doubt as to * * * guilt.' "[5] The conviction is therefore reversed and the case remanded to the District Court with directions to enter a judgment of acquittal.

Reversed.

## WILBUR K. MILLER, Circuit Judge (dissenting).

Farrar was tried and found guilty by Judge Schweinhaut, sitting without a jury. The appellant first denied and then admitted having had intercourse with the complaining witness, but said she had submitted voluntarily. So the issue at the trial was whether the victim had consented.

She testified Farrar met her on the street at night and, at what she thought was the point of a knife in her back, marched her to his apartment where, under threats of bodily injury, he forced her to yield to him. As soon as she escaped from the scene, the girl ran to a nearby fire house and reported the attack, whereupon the police were called.

It was argued strongly that the evidence was insufficient to support the conviction because the girl never saw a knife and Farrar had none when he was arrested at the apartment soon after the

event. The majority adopt that view. They also say that in other respects the testimony of the complaining witness was incredible; but in so doing they substitute their opinion concerning the credibility of witnesses for that of the trial judge.

Before discussing the law as to whether an appellate court may make that substitution, I think it well to point out what I regard as infirmities in the majority's statement of the case [1] which seem to me to make it fall short of being an objective narrative. When the testimony is viewed objectively, it becomes apparent that the case turns on the credibility of the witnesses and not on the sufficiency of the evidence; that there was evidence sufficient to convict if the prosecution's witnesses were credited.

At the outset, the majority say, "The complaining witness was an 18-year old girl to whom intercourse was not a new experience." This seemingly implies she was therefore unchaste, but there was no evidence that she had never been married. Anyway, the unchastity of the victim is not a defense to a charge of rape unless it is made so by statute, which has not been done in this jurisdiction.

The majority opinion says Farrar "brought her a drink of water at her request and poured some whiskey." This intimates that the victim shared Farrar's whiskey with him. In fact, however, the undisputed testimony is that she refused to partake of the whiskey.

My brothers also say:

5. Hopkins v. United States, 107 U.S.App. D.C. ——, 275 F.2d 155; quoting Cooper v. United States, 94 U.S.App.D.C. 343, 345, 218 F.2d 39, 41, and citing other cases.

In several of the cases cited in Hopkins, as in the present case, the defendant's guilt would have been clear beyond a reasonable doubt if the veracity of an essential witness had been unquestionable. Benton v. United States, 88 U.S.App.D.C. 158, 188 F.2d 625; Kelley v. United States, 90 U.S.App.D.C. 125, 194 F.2d 150; Wilson v. United

States, 1959, 106 U.S.App.D.C. 226, 271 F.2d 492.

Decisions sustaining particular verdicts are sometimes accompanied by dicta that all verdicts must be sustained. Decisions rejecting particular verdicts prove the contrary. So does the practice of directing verdicts.

1. Some of the infirmities in the statement of facts contained in the majority's original opinion have been corrected by them in their amended opinion, and so are not discussed or mentioned in this amended dissent.

" * * * Finally she partly dressed, went to a bathroom, 'turned both spigots on', left the building, went to a fire station, and said she had been raped. Police were called and took her back to appellant's room. He at first said he did not know her, but presently admitted he had intercourse with her. So much is undisputed."

While this terse statement is true, it is so incomplete that it does not reveal the full truth. It does not say why or how she was partly dressed, nor why she "turned both spigots on" in the bathroom. It mildly says she "went" to a fire station and inadequately states she

"said she had been raped." I reproduce in the margin the victim's testimony as to how she was clothed, why she "turned both spigots on," that she *ran* to the fire house at about 3:00 o'clock on a February morning, clad only in a skirt and sweater, and there tearfully told her story.[2]

No witness said she merely "went to a fire station, and said she had been raped." The girl said, "When I got outside I screamed—I went to crying. I left and ran all the way * * *." A fireman said he heard "loud crying on the outside" and, when he admitted her, "she was crying and it seemed like she was upset and nervous." I suggest there is

2. "The Court: What happened after that?
"The Witness: I begged him and begged him I wanted to go to the bathroom. I started to cry. I figured that was the only thing I could do to get away. I kept begging him to go to the bathroom. He told me, 'Go in naked.' I told him, 'I can't go out to the bathroom this way.' So he throwed me my skirt. I took the skirt and put the skirt over me and I said, 'What about the top part of my body?' you know, and so he throwed me his sweater. So when he had his back turned, I slipped one brassiere under the sweater.
"By Mr. Stevas:
"Q. He gave you his sweater to wear to the bathroom? A. Yes. All the rest of my clothes, coat, slip, brassiere, panties, blouse was in his room.
"Q. Did you put his sweater on? A. Yes, and my shoes.
"Q. Then what did you do? A. As I was going around to the bathroom, I turned the spigot on—I turned both spigots on.
"Q. Full force or just a dribble, how much? A. I turned them on all of the way, as far as it would go.
"The Court: Why did you do that?
"The Witness: I did it because he told me if I tried to leave, he would kill me. I tipped all the way back to the door and the floor made some noise, so I turned the spigots on so he couldn't hear the twitches of the floor. I don't guess he did. I went all the way back from the bathroom and I tipped all the way down the steps. When I got outside, I screamed—I went to crying. I left and *ran all the way* down to North Capital Street, turned on S Street. * * *" (Emphasis supplied.)

Farrar, unconsciously perhaps, corroborated the girl's testimony in a significant particular: about ten minutes after she had gone to the bathroom, he said he went there looking for her. She was gone, but the water was running.

With respect to her report at the fire house, I quote from the testimony of Edward Logan, a fireman who was on duty when she arrived:

"A. Well, I heard a loud crying on the outside of the house. I started to get up to see what the crying was and I heard some talking, some voices outside and I thought whoever was crying already received aid, so I sat down again.

"Finally, a knock came on the window. I went to the door and opened it.

"Q. When you opened the door, what if anything did you see? A. There was a girl dressed in a sweater and skirt. She came into the house and told me—

"Q. Don't tell me yet what she said. Have you seen that girl here today? A. Yes.

"Q. Do you know her name? A. Olivia—

"The Court: Was it Olivia Zollicoffer?

"The Witness: Yes, that is her name.

"By Mr. Stevas:

"Q. Would you describe for His Honor what she was doing? A. Well, she was crying and it seemed like she was upset and nervous.

\* \* \* \* \*

"The Witness: She said she had been attacked by a man with a knife. She told me she was actually walking home from the movies and a man had put a knife in her back.

"The Court: She said she had been attacked?

"The Witness: Yes."

a vast difference between the majority's statement that she "went to a fire station, and said she had been raped" and the actual facts shown by the undisputed testimony of two witnesses.

Again, the majority write as follows:

"The girl testified at appellant's trial that she walked with him to his room, and undressed, because he threatened to kill her if she refused to do so. But she did not testify that her taking part in intercourse was induced by those threats, or by words of any sort. She testified to the contrary. * * * "

Her testimony "to the contrary," then quoted in the majority opinion, was that she submitted to him because he menaced her with a knife. So, about all the majority are saying here is that the verbal threat which caused her to undress did not cause her to submit to intercourse, but that submission was due to a physical threat. This distinction is incomprehensible, except that the majority then demonstrate to their own satisfaction that Farrar had no knife; ergo, their conclusion is that she yielded to the menace of a knife when there was no knife.

Farrar testified he did not have a knife, and the girl said she did not see one. On that basis, the majority state there was no knife. In this connection, it is interesting to note the testimony of Mrs. Irma Smith, a policewoman who was called as a witness *by the appellant,* concerning statements made by Farrar in her presence at the police station. She said Farrar stated that, when the girl refused to undress and get in bed, "he might have held the knife against her neck at the time." I suggest that the fact the police found no knife and that the girl actually saw none is not conclusive that Farrar was not so armed. He might easily have disposed of his knife before the police arrived.

Whether there was a knife or not, I regard as immaterial. Some sharp instrument which she thought was a knife was pressed against her back and upon her neck; it was sufficient to inculcate the fear which she expressed.

Later in the majority's statement of facts, they say: "She [the complaining witness] afterwards accepted $15 from a girl friend of appellant." This is stated as a fact, although the majority later say she "denied that she got the money." But they omit to say that appellant's "girl friend," Mrs. McDaniels, had an interest which may well have shaped her story: she was living with Farrar while he was on bond, she had lived with him for some years and had had a child by him, although she was not married to him. Mrs. McDaniels also admitted she had tried to bribe the prosecuting witness by telling her "if she would drop the case" she would give her money. These undisputed facts were to be considered in determining her credibility.

Farrar's interest, which could have been thought to color his testimony, is of course apparent. Other phases of Farrar's testimony go to his credibility and serve to show why the trial judge, who observed his demeanor as he testified, refused to believe his testimony. For example, an officer said Farrar stated he had paid the girl $5.60 by placing it in her shoe. When a search revealed she had only 52 cents in her shoe or on her person, Farrar changed his story by saying he had merely promised to pay her $5.60. Another example: the clothing which the girl left in his room, Farrar said he placed in a trash can in the alley, where it was later recovered. His explanation was that he was "saving" it for her.

In view of the foregoing, I suggest the evidence was insufficient if the testimony of the girl is believed and if that of Farrar is disbelieved. On the other hand, the evidence was insufficient to convict, if Farrar is credited and the victim is discredited. In other words, the stories told by Farrar and the complaining witness were inconsistent—both could not have been telling the truth. In these circumstances, the finding of the trial judge depended upon his decision as to the credibility of the parties.

Judge Schweinhaut, the trier of the facts, did not hesitate in giving credence to the complaining witness instead of to the appellant. He had observed the demeanor of the parties as they testified and was in a much better position than we are to form an opinion as to their credibility. In his brief oral opinion he said in part:

"I will say this only: That I believe, on the fundamental issues in this case, the complaining witness did tell the truth and I believe that there is an abundance of evidence in the case which corroborates her testimony, including the testimony of the defendant himself. * * * I not only don't have a reasonable doubt about the matter; I don't have any doubt at all. The Court finds the defendant guilty as charged."

Thus the trial judge decided the case on the credibility issue; he chose to believe the girl instead of the appellant, and so had no doubt of the latter's guilt. I suggest he decided correctly on the basis of the evidence he found worthy of belief. The majority say, however, that a reasonable mind must necessarily have had a reasonable doubt as to appellant's guilt. Surely they do not intend to say Judge Schweinhaut was unreasonable in deciding as he did on the basis of the evidence *which he believed.* The majority statement must mean, then, that *they* believe Farrar's testimony and that, giving credence to what he said, a reasonable doubt was inevitable. It follows they are reversing the trial judge's decision as to the credibility of witnesses.

But the question here is not what we think of the evidence as it appears on printed pages. The issue on this appeal is whether we can properly disturb the determination of guilt made by an experienced trial judge on evidence which, if believed, amply supports it, and which he found so completely convincing. I think it is thoroughly settled that we have no such authority. In Daniels v.

Souders, 1952, 90 U.S.App.D.C. 298, 300, 195 F.2d 780, 781, this court said:

"Appellant also contends that the evidence is not sufficient to support the finding that she was guilty of adultery with appellee's husband. The credibility of the testimony is within the province of the trial court who saw the witnesses and heard them speak. We cannot say that the record did not warrant the inferences and conclusions that were drawn."

The opinion of this court in Morfessis v. Morfessis, 1950, 87 U.S.App.D.C. 292, 184 F.2d 468, stated:

"The findings of the District Court, sitting without a jury, 'shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' * As the trier of the facts, it is in the best position to consider the demeanor of the witnesses and to weigh their testimony. * * * *"

*"Rule 52(a), Federal Rules of Civil Procedure."

Repeating what it had said in Davis v. Schwartz, 1895, 155 U.S. 631, 636, 15 S.Ct. 237, 39 L.Ed. 289, the Supreme Court said in Adamson v. Gilliland, 1917, 242 U.S. 350, 353, 37 S.Ct. 169, 170, 61 L.Ed. 356: " * * * [S]o far as the finding of the * * * judge who saw the witnesses 'depends upon conflicting testimony or upon the credibility of witnesses * * * it must be treated as unassailable.' " The case of United States v. Oregon State Medical Society, 1952, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978, is to the same effect. There the Supreme Court said, 343 U.S. at page 339, 72 S.Ct. at page 698:

"As was aptly stated by the New York Court of Appeals * * *: 'Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his

power of observation often proves the most accurate method of ascertaining the truth. * * * How can we say the judge is wrong? We never saw the witnesses. * * * To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.' Boyd v. Boyd, 252 N.Y. 422, 429, 169 N.E. 632, 634."

As Judge Frank put it (writing for himself and Judges Learned Hand and Augustus N. Hand) in Broadcast Music v. Havana Madrid Restaurant Corp., 2 Cir., 1949, 175 F.2d 77, 80:

" * * * For the demeanor of an orally-testifying witness is 'always assumed to be in evidence.' It is 'wordless language.' The liar's story may seem uncontradicted to one who merely reads it, yet it may be 'contradicted' in the trial court by his manner, his intonations, his grimaces, his gestures, and the like —all matters which 'cold print does not preserve' and which constitute 'lost evidence' so far as an upper court is concerned. For such a court, it has been said, even if it were called a 'rehearing court,' is not a 'reseeing court.' Only were we to have 'talking movies' of trials could it be otherwise. A 'stenographic transcript correct in every detail fails to reproduce tones of voice and hesitations of speech that often make a sentence mean the reverse of what the words signify. The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried.' It resembles a pressed flower. The witness' demeanor, not apparent in the record, may alone have 'impeached' him. * * *

"Without doubt, the result of our procedure is to vest the trial judge with immense power not subject to correction even if misused: His estimate of an orally testifying witness' credibility may stem from the trial judge's application of an absurd rule-of-thumb, such as that when a witness wipes his hands during his testimony, unquestionably he is lying; but, unless the judge reveals of record that he used such an irrational test of credibility, an upper court can do nothing to correct his error. * * * "

It was said in Creamer v. Bivert, 1908, 214 Mo. 473, 113 S.W. 1118, 1120–1121:

" * * * In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light, and yet not a soul who heard it, nisi, believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify. * * * "

The rule that the determination of credibility of witnesses at the trial level will not be disturbed on appeal applies also to criminal cases. The Supreme Court said in Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. United States v. Manton, 2 Cir., 107 F.2d 834, 839, and cases there cited."

This court said in Wigfall v. United States, 1956, 97 U.S.App.D.C. 252, 230 F.2d 220, 221, "In our jurisprudence the credibility of witnesses and the derivation of the truth from oral testimony are reposed in the hearer of the witnesses. Demeanor, inflection and gesture, both on direct examination and under cross examination, are elements in those determinations." And in Hardeman v. United States, 1947, 82 U.S.App.D.C. 194, 163 F.2d 21, we said, "The jury heard the witnesses testify and reached the conclusion that appellant was the thief, and in the circumstances it was for them and not for us to decide that question."

The Seventh Circuit, in United States v. Marshall, 1959, 266 F.2d 92, considered a rape case somewhat similar to this one. To convict, the jury had to credit the somewhat shaky testimony of the complaining witness that Marshall forced her submission at the point of a knife. The jury chose to believe the girl and rejected Marshall's testimony as to an alibi in which he was corroborated by his mother. Citing Glasser v. United States, supra, the Seventh Circuit said, "It is not for us to determine the credibility of the witnesses who were heard and viewed by the Trial Judge and the jury." [266 F.2d 94.]

For these reasons, I dissent from the action of the majority.

Before PRETTYMAN, Chief Judge, and EDGERTON, MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, in Chambers.

Order—Filed February 16, 1960

Upon consideration of appellee's petition for rehearing in banc, it is

Ordered by the court that the petition for rehearing in banc is denied.

Circuit Judges MILLER, DANAHER, BASTIAN and BURGER would grant the petition for rehearing in banc.

Memorandum on Petition for Rehearing In Banc.

Filed February 16, 1960

PRETTYMAN, Chief Judge.

■ I do not view this case, as the petition for rehearing would have us do, as an evaluation of comparative credibility, or as an appellate redetermination of disputed issues of fact. My view is that upon the testimony of the complaining witness the Government did not make out a case of rape. This is a question of law.

Rape is a serious crime, one of the most serious; it carries a possible death sentence. It has been axiomatic from the earliest days of the common law that courts scrutinize with special caution the evidence of the prosecution in this type of case.[1]

First let me note some of the features of this present case often commented upon as present or absent in cases reported in the books. These facts are not determinative of the issue; they are background facts frequently mentioned by the courts. The girl was eighteen years old, full-grown in other words; not physically incapacitated in any way, not a child, not immature. The affair lasted for several hours. It took place on a public street, lighted, and in a room in an apartment house; it did not occur in an isolated spot. It did not occur in a sudden tempestuous incident. The girl did not run or attempt to run when she was accosted. She did not scream, yell, or cry out at any time; at times, she said, she was "sort of weeping like but it wasn't loud", "like a moaning cry". She did not resist in any way. She took all her clothes off when he told her to do so. There was no racial difference between the parties, such as a white man and a Negro girl or a Negro man and a white girl, which circumstances often give rise to fear; both were Negroes. She did not claim the man was of unusual size or apparent strength. This was not an assault upon chastity; she had had sexual experience before these events. No physical violence of any sort was involved. She was taken at once to a hospital for an examination but was not detained there. The Government proffered no evidence of bruises or injury of any sort.

Next I look at the affirmative testimony—her testimony—as to what this man did during the time involved in the alleged offense. He walked with the girl some two or three blocks. He opened the house door and the room door and then locked the room door behind him. He laid her clothes on the couch. He took his own clothes off. They had intercourse on the bed. He went out of the room and brought a glass of water back

---

1. 1 Hale, Pleas of The Crown 635–636 (1778).

to her. He poured out two little glasses of whiskey. He took the whiskey glass from her and put the glasses on the dresser. He offered her a cigarette. Some forty-five minutes after the first intercourse they had intercourse again.

Now I come to the determinative feature of the case, as I view it. The complaining witness rested her claim of fear upon a simple physical fact—a knife. Throughout her testimony she insisted that he had a knife.[2] She repeatedly said he had it in his left hand. Over and over she said he put a knife to the back of her neck. But she never saw any knife.[3]

■ As I understand the law of rape, if no force is used and the girl in fact acquiesces, the acquiescence may nevertheless be deemed to be non-consent if it is induced by fear; but the fear, to be sufficient for this purpose, must be based upon something of substance; and furthermore the fear must be of death or severe bodily harm.[4] A girl cannot simply say, "I was scared," and thus transform an apparent consent into a legal non-consent which makes the man's act

a capital offense.[5] She must have a reasonable apprehension, as I understand the law, of something real; her fear must be not fanciful but substantial.[6]

In the case at bar there was an apparent acquiescence on the girl's part. She said she took off all her clothes, lay down on the bed, and had intercourse twice, some forty-five minutes apart. But she said she did this because she was scared. And she was quite clear, emphatic and insistent upon the cause of her fear: The man had a knife in his hand. The reason for her fear was tangible and definite. It was a knife, and it was in his hand. She so testified repeatedly.

But she never saw any knife. Now it is perfectly apparent that, if this man had had a knife in his hand while he was doing all the things she said he did over this two or three hour period, she must have seen it. He could not have had a knife and have done all these things, with her watching him as she said she did, without her seeing the knife. As a matter of fact, at the close of the Government's testimony the trial judge struck from the record all the testimony

---

2. Here are parts of her testimony: "[I]t was a knife". "[H]e stuck a knife in my back"; "had this sharp knife". "I know it was a knife * * * he put the blade around the back to my neck." "[H]e put the knife on around my neck again." "He had it in the left hand, I think." "He had it in his left hand." "When I was sitting on the bed, he put the knife to my neck, like around like that. I think it was a knife; I didn't turn around to see what it was." "He stood up there with the knife in his hand." "He put the knife around my neck again." "[H]e put the knife around my neck."

The fireman to whom she appeared at the firehouse testified: "She said she had been attacked by a man with a knife."

3. Here are other parts of her testimony: The court asked: "But you didn't see it [the knife]?" Witness: "I didn't see it." The court again: "Did you ever see what you thought was a knife or any kind of sharp instrument * * *?" Witness: "I will tell you the truth, I never did see it but I felt it." On cross: "You have already told the Court and the government attorney that

you at no time saw a knife, isn't that right?" A. "That is right, but I felt it." "I didn't see the knife at that time; I was so scared at that time." "My eyes weren't closed; I was looking." "I was looking at him." "No, I didn't see it [the knife]." Q. "Did he have any clothes on at that time?" A. "No. His shorts, that's all." Q. "Did you see any knife stuck in his shorts?" A. "No." Q. "Did you see a knife in his hand at any time during this forty-five minutes between these two acts of intercourse?" A. "I wasn't looking for a knife."

4. Note, Forcible and Statutory Rape: An Exploration of the Operation and Objectives of the Consent Standard, 62 Yale L.J. 55, 57 (1952).

5. See, e. g., Deffenbaugh v. State, 32 Ariz. 212, 257 P. 27, 29 (1927); State v. Dill, 4 Terry 533, 42 Del. 533, 40 A.2d 443, 444 (Del.Ct.Oyer & Terminer 1944).

6. E. g., Davis v. Commonwealth, 186 Va. 936, 45 S.E.2d 167 (1947); Allison v. State, 204 Ark. 609, 164 S.W.2d 442 (1942).

concerning the knife, "leaving her testimony in that it was something that felt sharp and felt like a knife." The judge said if there had been a knife the girl would have seen it.

But, if she would necessarily have seen a knife if the man had had one, she would necessarily have seen anything else of the size or shape of a knife. She made no claim he had any such article. Moreover she made no claim he had the knife concealed in some fashion, such as in his pocket, so that she was afraid he might have one even though he did not. In fact during most of this time he wore only a pair of shorts. Although the law of rape may be elastic enough to permit easy speculations as to what might have frightened the girl in such a case,—*e. g.*, she thought there was a knife although there was none—the record before us does not permit of such speculations. If the man had had any weapon she would necessarily have seen it; she saw none. The law may permit conviction of rape upon the basis of a concealed knife, but it does not permit conviction premised upon an invisible knife. The rape penalty does not rest upon imaginary fears.

Upon the foregoing facts and circumstances, when the knife disappeared from the record as a possible fact, the charge of rape disappeared, as I view the matter. The only basis for fear advanced by the prosecutrix was the knife; she suggested no alternative cause for fear. The only factual substance to any of the intangible threats allegedly made by him to her was the knife. There was no force or violence and no threat or fear of force or violence except for the knife. The charge of rape rested upon the presence of the knife. The Government failed to prove a case of rape.

I see no reason for an *en banc* consideration of the decision of the division which heard the case.

Our dissenting brother puts much stress upon the care with which the girl turned on the water in the bathroom, tiptoed out of the house, and ran down to the firehouse, crying. These are circumstances, he posits, which corroborate the claim of rape. But this circumstantial evidence is clearly as consistent with innocence as with guilt—with a vengeful purpose after a quarrel over money as with a rape. In my view it is of little or no value as corroboration in this case.