## RANDY JAY GOLDBERG *v.* STATE OF MARYLAND

[No. 186, September Term, 1978.]

*Decided January 10, 1979.*

The cause was submitted on briefs to GILBERT, C. J., and MELVIN and COUCH, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Bradford C. Peabody, Assistant Public Defender,* for appellant.

Submitted by *Francis Bill Burch, Attorney General, Diane G. Goldsmith, Assistant Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Thomas Morrow, Assistant State's Attorney for Baltimore County,* for appellee.

MELVIN, J., delivered the opinion of the Court.

On October 18, 1977, Randy Jay Goldberg, the appellant, was found guilty by a jury in the Circuit Court for Baltimore County, of rape in the second degree (Art. 27, Section 463 (a)

(1)). The appellant was sentenced to a five year term, of which the first two years were to be served in a work release program at the jail and the remaining three years on probation.

On appeal the appellant contends that:

1. the evidence was insufficient to sustain his conviction;
2. the court erred by not, *sua sponte,* declaring a mistrial;
3. the court erred in denying a motion to suppress an oral statement made by appellant at the time of his arrest.

## I

The eighteen year old prosecuting witness was a high school senior who worked part-time as a sales clerk in the Merry-Go-Round clothing store at Towson Plaza. Around 1:00 P.M., on August 10, 1977, she was at work when the appellant, aged twenty-five, entered the store. The prosecuting witness started out trying to sell the appellant clothing but ended up being sold a story by the appellant that he was a free-lance agent and thought she was an excellent prospect to become a successful model. They arranged to meet at 5 o'clock when she got off from work.

When the appellant returned for her at 5:00 P.M., she asked him for "any ID to show me if you are who you say you are". He showed her his driving license with his picture on it. This satisfied her: "Well, I figured that he wouldn't . . . if he was planning to harm me in any way . . . wouldn't give his name like that, and I figured that, you know, he was who he said he was. I believed him". Despite some cautioning from her employer she drove off with the appellant at 5:10 P. M. in a silver-grey Cadillac Eldorado. The appellant was actually a student at Catonsville Community College and the car belonged to his mother. Appellant told her he was taking her to "a temporary studio" in the Pikesville area. When the "studio" was found to be closed, they drove to a condominium

building on Slade Avenue. Upon arrival there she stayed in the car while appellant went inside. Shortly, he returned to the car and told her he had contacted a friend who said they could use his house for his "studio". When they arrived at the friend's house, she helped appellant find a door that was open. The door led to the kitchen which she described as "very dirty" and she "didn't, you know, understand why we were coming here". From the kitchen they walked into the bedroom which by contrast she described as being "really made up really nice" with "a queen sized bed, real big bed, with a red velvet bedspread, and a big backboard on the back." She was "pretty impressed by the room".

Soon after they entered the bedroom, appellant "motioned" her to sit beside him on the bed. Instead, she sat on a chair at the foot of the bed. Appellant then said it was hot in the room and took his shirt off. When asked her reaction to appellant's removing his shirt she responded: "He told me he was hot, so I figured — so I figured he was hot". She then stood up and appellant "came over to me and he started unbuttoning my blouse. He said this is what I want you to do". She pulled her blouse together and said "no". Asked to describe what happened next she said:

> "He just kept on smooth-talking me and saying I won't hurt you. This is what I do to all the models that I interview. And he, you know, started *motioning* me to take my blouse off and everything, and then I went through the same thing with every piece of clothing. It was like, you know, kept on trying to tell me to take it off, and I didn't want to. And he kept on trying to convince me that — he was still trying to convince me that this was this modeling job, and I knew that it wasn't any more." (Emphasis added.)

She said she removed her clothes because she "was really scared of him". "There was nothing I could do". When asked what caused her fright she said: "Because he was — he was so much bigger than I was, and, you know, I was in a room alone with him, and there was nothing, no buildings around

us, or anything, and I mean wouldn't helped if I wouldn't — help me if I didn't. It was like being trapped or something". On cross-examination she said she was "afraid" she was "going to be killed".

After her clothes were removed, the appellant "pushed" her down on the bed and tried "to move [her legs] in different ways, and [she] kept pulling them together, and telling him that [she] didn't want to do it, and just wanted to go home". He kept telling her that he wouldn't hurt her "and just to relax". But she was "just really scared" and she was "shaking and my voice was really shaking" and she "kept on telling him [she] wanted to go home", and that "[she] didn't want to do this"; that she "didn't want to be a model, and [she] didn't want to do it any more. Just to let [her] alone". When asked, "And what was his reaction?", she testified as follows:

"A. He was just — he was just really cool about the whole thing, telling me not to worry, and he wouldn't hurt me, and to relax.

Q. All right. Now, after you were on the bed, and he was moving your legs around, what, if anything, occurred next?

A. Well, he kept on trying to make me get in different positions, and kept on telling me to look sexual or something like that. I don't know what the word was.

Q. All right. And what, if anything, occurred after he said that?

A. He laid me down and placed his hands on my vagina and told me he was doing that to make me relax. I told him that it didn't make me relax.

Q. All right. Then what happened after he placed his hands on your vagina?

A. He went into the other room, and I couldn't see him. He wasn't facing me, and had his back to me, and his hands down by his belt buckle. And I realized what he was doing, and I jumped up grabbed my clothes and started putting them on.

Then he came in and pulled them away from me and said no.

Q. What did he say?

A. He said don't worry. What are you doing that for. I am not going to hurt you, and he kept telling me just to relax, and not to be nervous. And he laid me down on the bed and tried to get me to that stuff again, and I told him I didn't want to do that.

Q. What happened then?

A. And then he put his arms up on my stomach and his torso was in between my legs. He said just take your time; take a deep breath. And then he moved up on me and placed his penis in my vagina.

Q. What were you doing when this occurred?

A. I squeezed my legs together and got really tense, and I just started crying real hard. And I told him not to do that to me.

Q. And what was his response?

A. He didn't say anything. Just stayed there. And then I felt him move.

Q. How long was he on top of you?

A. Not very long.

Q. How long was he moving?

A. I guess for about two minutes, and then I felt him. Just for about two minutes.

Q. Did the Defendant ejaculate to your knowledge?

A. Yes, I think he did.

Q. Now, what, if anything, occurred after the Defendant ejaculated?

A. He got up and he said that if I can't enjoy it, then he can't enjoy it."

The appellant then asked her to go to dinner with him but she declined and he drove her to her home where she lived with her parents. On the way home, the appellant gave her his telephone number which she wrote down on a piece of paper. At his request she gave him her telephone number by writing it on a piece of paper with her lipstick. Although she told him she "would never see him again", she said she gave him her correct telephone number because she "didn't want to get him suspicious of me". They had a "general

conversation about sex" in which he told her that "girls act like they don't want to, but they really do". She told him that he "had the wrong impression of [her]"; that she "didn't want him to do that". She further testified, somewhat inconsistently, as follows:

"I told him I didn't want that. I told him I didn't like him doing that to me, and *didn't let him.* I didn't make him think that I enjoyed all of it, and that I ever wanted to do it again, because *I know I would never do it again.* Never. I know I would never get near him again." (Emphasis supplied).

The appellant let her off at her home at 6:25 P. M., 1¼ hours after she left her place of employment with him at 5:10 P. M. Before the appellant drove off she told him to "drive home safely ... I guess I was being more sarcastic than anything". She estimated that they had been at the house where the alleged rape took place for 30 minutes.

When she arrived inside her house she "walked straight pass my parents" to her upstairs room. She said nothing to them because she was "just scared, nervous, just, you know, I wanted to go upstairs and just clean myself up and just forget, you know, about it. Just think". After cleaning herself and using a contraceptive, she called her boyfriend on the telephone and talked to him for "about three minutes". She did not tell him "what happened" because she "didn't know how he would take it". She then called her girlfriend and told her that she "had a problem, and that I was raped today . . . ." She did not relate the details of the "rape". She told her girlfriend not to tell anybody and not to tell her girlfriend's boyfriend, "but she told him anyways". She contemplated calling the police but said she "didn't know who to call", so she called her girlfriend back and asked what she should do. Shortly thereafter the girlfriend and the girlfriend's boyfriend came to her house and after picking up her own boyfriend the four young people eventually went to the police station where the "rape" was reported at approximately 9:00 P. M. According to the girlfriend, the prosecuting witness did

not want to report the matter but "[w]e convinced her into going to the police".

After reporting the incident the prosecuting witness was taken to the Greater Baltimore Medical Center for a physical examination. The examining physician's "Impression" was "Recent sexual intercourse", but he found "no evidence of recent trauma" to any part of her body, including the "perineal and genital" areas.

Testifying in his own behalf, the appellant admitted having sexual relations with the prosecuting witness at the time and place alleged, but maintained that it was mutually consensual and that the prosecuting witness did not appear to be frightened at any time.

## II

Prior to 1976, the Maryland rape statute was primarily a sentencing law, fixing the penalties without actually defining the crime.[1] The common law definition of rape that has been applied in Maryland is: "the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without the consent and against the will of the victim". *Hazel v. State,* 221 Md. 464, 468-469, 157 A. 2d 922 (1960).

By Chapter 573 of the Laws of 1976, effective July 1, 1976, the Legislature divided the crime of rape into "rape in the first degree" and "rape in the second degree". See Art. 27, § 462 (first degree rape) and § 463 (second degree rape), (Md. Code, 1957, 1976 Repl. Vol., 1978 Cum. Supp.). Section 463 provides, *inter alia,* that,

> "A person is guilty of rape in the second degree
> if the person engages in vaginal intercourse with
> another person:
>> (1) By force or threat of force against the will
>> and without the consent of the other person
>> . . . ."

---

1. See "Rape and Other Sexual Offense Law Reform in Maryland, 1976-1977", 7 U. Balt. L. Rev. 151 (1977).

Section 462 deals with first degree rape and provides, *inter alia,* that,

> "A person is guilty of rape in the first degree if the person engages in vaginal intercourse with another person by force against the will and without the consent of the other person *and*:

> \* \* \*

> (3) threatens or places the victim in fear that the victim ... will be imminently subjected to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping ...".[2]

Section 464E of the new Act provides that,

> "Undefined words or phrases in this subheading [Sexual Offenses] which describe elements of the common law crime of rape shall retain their judicially determined meaning except to the extent expressly or by implication changed in this subheading".

The terms "force," "threat of force," "against the will" and "without the consent" are not defined by the 1976 Act. We therefore look to the "judicially determined meaning" of these elements of the common law crime of rape. In doing so, we conclude that the evidence was legally insufficient to sustain the conviction and the judgment will be reversed. We reach this conclusion because on the record before us, viewing the evidence in the light most favorable to the State, we find

---

2. In the instant case, the first count of the six count indictment charged rape in the first degree. This count was "withdrawn" by the State before trial. This would seem to be a concession by the State that it lacked legally sufficient evidence that vaginal intercourse occurred because of any threats or acts on the part of the appellant that placed the prosecuting witness "in fear" that she would be "imminently subjected to death" or "serious physical injury". There was no concession, however, of the absence of "force or threat of force" that are essential alternative elements of rape in the second degree. Also, of course, the fact that the first count was withdrawn did not preclude the State from offering proof of first degree rape in its attempt to prove the lesser included offense of second degree rape.

legally insufficient evidence of the requisite element of "force or threat of force".

There was certainly no "threat of force". On the contrary, the prosecuting witness on numerous occasions in her testimony negated that element. As to actual force, the only arguable evidence is the prosecuting witness' testimony that after she herself had removed all her clothes, the appellant put his hands on her shoulders and "pushed" her down on the bed. This is negated, however, by her further testimony on cross-examination that "he didn't push but guided [her] on the bed". She admitted that she was not "injured or anything" by the encounter. This, of course, is consistent with the findings of the physician who subsequently examined her. Those findings so far as they relate to the use of any actual force were completely negative. But *actual physical* force is not an indispensable element of the crime of rape.

As said by the Court of Appeals in *Hazel v. State, supra,* at 469:

> "Force is an essential element of the crime and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force *or that she was prevented from resisting by threats to her safety.* But no particular amount of force, either actual or constructive, is required to constitute rape. Necessarily that fact must depend upon the prevailing circumstances. . . . [F]orce may exist without violence. If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim — having regard to the circumstances in which she was placed — a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force. *State v. Thompson,* 227 N. C. 19, 40 S. E. 2d 620 (1946). *See also State v. Dill,* 3 Terry 533, 40 A. 2d 443 (Del. 1944); 75 C.J.S., Rape, § 12b; 44 Am. Jur., Rape, § 5. *Cf. Selvage v. State,* 148 Neb. 409, 27 N. W. 2d 636 (1947). (Emphasis added.)

"With respect to the presence or absence of the element of consent, it is true, of course, that however reluctantly given, consent to the act at any time prior to penetration deprives the subsequent intercourse of its criminal character. There is, however, a wide difference between consent and a submission to the act. Consent may involve submission, but submission does not necessarily imply consent. Furthermore, submission to a compelling force, or as a result of being put in fear, is not consent. *State v. Thompson, supra; State v. Dill, supra.*

"The authorities are by no means in accord as to what degree of resistance is necessary to establish the absence of consent. However, *the generally accepted doctrine seems to be that a female — who was conscious and possessed of her natural, mental and physical powers when the attack took place — must have resisted to the extent of her ability at the time, unless it appears that she was overcome by numbers or was so terrified by threats as to overpower her will to resist.* Am. Jur., Rape, § 7. Since resistance is necessarily relative, the presence or absence of it must depend on the facts and circumstances in each case. *See Kidd v. State,* 97 Okla. Crim. 415, 266 P. 2d 992 (1953). But the real test, which must be recognized in all cases, is whether the assault was committed without the consent and against the will of the prosecuting witness. (Emphasis added.)

"The kind of fear which would render resistance by a woman unnecessary to support a conviction of rape includes, but is not necessarily limited to, a fear of death or serious bodily harm, or a fear so extreme as to preclude resistance, or a fear which would well nigh render her mind incapable of continuing to resist, or a fear that so overpowers her that she does not dare resist. *State v. Hoffman,* 228 Wis. 235, 247, 280 N. W. 357 (1938)."

Applying these principles to the present case, we hold that the evidence is legally insufficient to warrant a finding by the jury that the prosecutrix exerted the necessary degree of resistance that was overcome by force or that she was prevented from resisting by fear based upon reasonable apprehension of bodily harm.

The State argues that the "totality of [the] circumstances" caused the prosecutrix's fear of being killed and that the fear was a reasonable fear, thus rendering more resistance than that exerted by her unnecessary. First of all, we find nothing in the record evidencing any real resistance by the prosecutrix to anything the appellant said or did. It is true that she *told* the appellant she "didn't want to do that [stuff]". But the resistance that must be shown involves not merely verbal but *physical* resistance "to the extent of her ability at the time" (*Hazel v. State, supra,* at 460). The State points to her testimony that when penetration occurred she "squeezed [her] legs together and got really tense". Assuming that this was evidence of her reluctance, even unwillingness, to engage in vaginal intercourse, it was not evidence that she resisted "to the extent of her ability" *before* the intercourse occurred.

We are left therefore with the question of whether the prosecutrix's lack of resistance was caused by fear based upon reasonable apprehension of physical harm. We find no legally sufficient evidence warranting an affirmative answer to that question. As we said in *Winegan v. State,* 10 Md. App. 196, 200, 201, 268 A. 2d 585 (1970):

> "... [W]here the victim's story could not be corroborated by wounds, bruises or disordered clothing, the lack of consent could be shown by fear based upon reasonable apprehension. The rule requiring the apprehension be reasonable was first enunciated in Maryland in *Hazel v. State,* 221 Md. 464, 469, 157 A. 2d 922:
>> 'If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim — having regard to the circumstances in which she was placed —

a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force.'

"The rule of reason, as we shall call it, was reiterated, either expressly or impliedly, by us in *Walter v. State, supra,* [9 Md. App. 385, 264 A. 2d 882 (1970)] and *Rice v. State, supra,* [9 Md. App. 552, 267 A. 2d 261 (1970)]. It is expressly supported by several cases throughout the country. [Citations omitted]".

On the record before us, we find the evidence legally insufficient to warrant a conclusion that the appellant's words or actions "were reasonably calculated to create in the mind of the victim" a reasonable fear that if she had resisted he would have harmed her, or that, faced with such resistance, he would have used force to overcome it. The prosecutrix swore that the reasons for her fear of being killed if she did not accede to appellant's advances were two-fold: 1) she was alone with the appellant in a house with no buildings close by and no one to help her if she resisted, and 2) the appellant was much larger than she was. In the complete absence of any threatening words or actions by the appellant, these two factors, as a matter of law, are simply not enough to have created a reasonable fear of harm so as to preclude resistance and be "the equivalent of force". (*Hazel v. State, supra,* at 469.) Without proof of force,[3] actual or constructive, evidenced by words or conduct of the defendant or those acting in consort with him, sexual intercourse is not rape. This is so even though the intercourse may have occurred without the actual consent and against the actual will of the alleged victim. Thus it is that in the absence of actual force, unreasonable subjective fear of resisting cannot convert the conduct of the defendant from that which is non-criminal to that which is criminal.

---

**3.** *I.e.* force beyond what is involved in the very act of intercourse itself. *See Perkins on Criminal Law,* p. 162 (2nd ed. 1969).

## III

As the judgment of conviction must be reversed for insufficiency of the evidence, it is not necessary to decide the other two questions presented by this appeal. With respect to the third question (propriety of the trial court's denial of a motion to suppress an oral statement made by appellant at the time of his arrest) we have assumed that the ruling was correct and have considered the oral statement as part of the evidence in the case. When the arrest warrant was served on the appellant, he said, according to the arresting officer, "[S]omeone must be playing a joke on me. I don't even know the girl". Appellant challenged the admissibility of the statement on the ground that the State had failed to properly comply with the Maryland Rules concerning discovery in criminal cases. The trial court denied the motion to suppress. At trial the appellant testified that when he read the warrant he "was floored at first" because he didn't recognize the prosecutrix's last name. He said he did not recall, but did not deny, making the statement to the arresting officer. While this evidence may have been regarded by the jury as affecting the appellant's credibility, it does not affect our conclusion that the evidence as a whole was legally insufficient to sustain his conviction of rape in the second degree.

*Judgment reversed.*[4]
*Costs to be paid by Baltimore County.*

---

**4.** We note that at the close of all the evidence, the court granted defendant's motion for judgment of acquittal as to the third count of the indictment (third degree sexual offense, Art. 27, § 464B) and that the fifth and sixth counts (assault with intent to rape and common law assault, respectively) were nol prossed by the State. As noted, *supra,* the first count (first degree rape) was "withdrawn" before the trial began. The case went to the jury, therefore, on the second count (second degree rape) and the fourth count (fourth degree sexual offense, Art. 27, § 464C) of the indictment. The verdict of the jury, however, was rendered only "as to Count Two, rape in the second degree". There was no verdict rendered or taken as to the fourth count. The trial court in its final instructions to the jury told the jury that "if your verdict is guilty of [rape in the second degree], then you should not consider the Fourth Count [fourth degree sexual offense]. It would merge". Assuming under proper circumstances that the lesser crime does merge into the greater crime, there must first be a verdict as to both crimes in order to invoke the doctrine of merger. The "merging" is done by

---

the court, not the jury. Here, without a verdict on the lesser charge, there was nothing to merge. We are therefore precluded from considering the legal sufficiency of the evidence as to the fourth degree sexual offense, a crime which we note does not require proof of "force" to sustain a conviction. We think the better practice in cases such as this is to instruct the jury to render a separate verdict on each count submitted to the jury and allow the court to merge the "mergeable" offenses.