## LESLIE WAYNE WALTER *v.* STATE OF MARYLAND

[No. 245, September Term, 1969.]

*Decided April 29, 1970.*

386

The cause was argued before MURPHY, C.J., and MOR-
TON, ORTH, and THOMPSON, JJ.

*Alan Hamilton Murrell* for appellant.

*William E. Brannan, Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, Samuel
A. Green, Jr., State's Attorney for Baltimore County,
Charles E. Moylan, Jr., State's Attorney for Baltimore
City,* and *Michael E. Kaminkow* and *I. Seymour Orlinsky,
Assistant State's Attorneys for Baltimore City,* on the
brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Leslie Wayne Walter, the appellant, was convicted of
rape by Judge Kenneth C. Proctor presiding without a
jury in the Circuit Court for Baltimore County to which
court the case had been removed from the Criminal Court
of Baltimore. The sentence was to a term of 12 years. The

sole question on appeal concerns the sufficiency of the evidence to support the verdict.

There was evidence from which the trial judge could find: At about 1:30 A.M. on August 17, 1968, Margaret Propst, the 39 year old victim, and her friend, John Oliphant, both Negroes, were parked in his automobile in Druid Hill Park in Baltimore. After being there only a short while, a police car approached and two officers got out. The white appellant, Officer Leslie Wayne Walter, walked over to their car and asked for identification which was given. Officer Walter then told the couple it was after hours and that they could be locked up. He then stated he was going to take Miss Propst to the stationhouse; John Oliphant was told to remain there with Offier Myers until he and Miss Propst returned. After a short drive, the defendant stopped the car behind the reptile house near the entrance to the park, and demanded that she have sexual relations with him. He then moved from his position under the wheel to the middle of the seat, unloosened his belt, pulled his pants and shorts down and then pulled Propst over on him. The victim became hysterical, knowing he had a gun, and being afraid because of his abrupt tone of voice, she obeyed his command. She then removed her pants and straddled him. Whereupon he completed the sex act. He then took a handkerchief from his pocket, cleaned himself, and gave it to Propst who threw it onto the ground. (The handkerchief was later recovered). On the way back to where Officer Myers and John Oliphant were waiting, the appellant told the victim to say they had been to the stationhouse.

Upon their return, Miss Propst got out of the police car and Officer Myers got in, and the appellant drove away at a high rate of speed. According to John Oliphant, the victim was hysterical. Oliphant was unsuccessful in getting her to tell him what had happened other than she wanted to get away from there because she was afraid the appellant was "going to hurt me (John Oliphant) . . . he's got a gun . . ." Oliphant noted the license number of the police car and went to the Northern Po-

lice Station. Miss Propst stayed in the car, but after some persuading by an officer, she went into the stationhouse where both the victim and Oliphant made statements as to the crime.

A more exact statement of the case can be gleaned from some of the prosecuting witness's testimony:

"Q. What was Officer Walter talking to you about?

"A. He said, 'Do you know that I could lock you up for being out here,' and then he said that he knew a captain at the station house to talk to this captain; and I asked him if Johnny was going and he said no. I asked him why Johnny couldn't go, and he said Johnny stays here until we come back and we'll go to the station house. And then that's when he began to talk loud and said, 'Come on, let's go, come on,' and so I got in the police car and went with him."

\* \* \*

"Q. And when he stopped there, what, if anything, did he say?

"He said, 'Come on, do with me what you was going to do with your boy friend.' And I asked him, 'What was I going to do with my boy friend,' and he began to yell loud and telling me to hurry up and come on. So at that point I began to start crying and got hysterical, and I just didn't know what he was talking about, and he just pulled me over on him."

\* \* \*

"Q. How did he pull you over?

"A. He just took his hand and pulled me over.

"Q. In which direction were you facing when he pulled you over?

"A. I was facing him; my face was facing him. I was straddling him.

"Q. You were straddling him?

"A. Yes.

"Q. Where were your legs?

"A. My legs was on each side of him.

"Q. And what, if anything, happened then?

"A. Then he put his penis in my vagina."

* * *

"THE COURT: . . .When he grabbed you and pulled you over, what did you do?

"A. I just went over on him because I was hysterical, and I was afraid because he was a police officer."

She testified further on cross-examination:

"Q. Talk to the captain about what?

"A. About me not, so we wouldn't have been locked up; and I asked him why Johnny couldn't go too, and he said Myers was going to stay to talk to Johnny until we got back, and then he says, come on, let's go.

"Q. And then you proceeded to do what?

"A. I went with him because I was scared.

"Q. You went with him why?

"A. Because I was scared.

"Q. You were scared of the fact he was a police officer?

"A. Yes.

"Q. Were you scared of being locked up?

"A. No, of him being a police officer."

* * *

"Q. I see; now, when the car stopped and you said to him, is that the police station, what happened then?

"A. Then he says, no.

"Q. No, it's not a police station?

"A. No.

"Q. Now, you're sitting on the righthand side of the car, aren't you?

"A. Yes.

"Q. Did it ever dawn on you at that time to open the door and get out of the car?

"A. I was scared."

* * *

"Q. Well, again I ask you, why didn't you open the door of the car on the righthand side and get out of the car?

"A. Because he was a police officer, and he had a gun and I was afraid.

"Q. Did you think he had a gun and thought that he was going to use the gun when he opened up his pants?

"A. Yes, he might have shot me.

"Q. Beg your pardon?

"A. If I ran, he might have shot me or something."

* * *

"Q. You certainly knew when you arrived in a sitting position on his legs that your pants were off at this point, didn't you? You knew they were off, didn't you?

"A. Yes.

"Q. Well, I'll ask you again why at this point didn't you holler for help?

"A. Because I was so scared and hysterical.

"Q. Well, why did you take your pants off?

"A. Because I was afraid of him; I was hysterical.

"Q. Did it ever dawn on you not to get on his legs and straddle his legs?

"A. No, because I was too afraid and hysterical.

"Q. I see. Did he bruise you or harm you in any manner?

"A. He was talking loud."

The State contends this evidence was sufficient to support a rape conviction and relies on the leading Maryland case, *Hazel v. State,* 221 Md. 464, 468, 157 A. 2d 922

which gave the common law definition of rape as "the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without the consent and against the will of the victim." The opinion analyzes the law stating force is an essential element of the crime and the evidence must show either the victim resisted but her resistance was overcome by force, or she was precluded from resisting by threats to her safety, i.e., the force was constructive. Absence of consent, also an element, can be established by the resistance, and the amount of resistance required is relative, depending on the circumstances. The Court said at page 470: "But the real test, [whether physical resistance is present or absent] which must be recognized in all cases, is whether the assault was committed without the consent and against the will of the prosecuting witness." Then the Court's language went somewhat further than other cases, particularly the older ones in allowing proof of lack of consent when physical resistance is absent, saying at page 470:

> "The kind of fear which would render resistance by a woman unnecessary to support a conviction of rape includes, *but is not necessarily limited to,* a fear of death or serious bodily harm, or a fear so extreme as to preclude resistance, or a fear which would well nigh render her mind incapable of continuing to resist, or a fear that so overpowers her that she does not dare resist." (Emphasis added)

The Court further pointed out submission is not the same as consent, and differs from a reluctant consent.

Professor Rollin M. Perkins in his book *Criminal Law* (1957 Ed.) criticizes the common law definition of rape at page 121:

> "If force is declared to be an element of the crime it becomes necessary to resort to the fiction of 'constructive force' to take care of those cases in which no force is needed beyond what

392

is involved in the very act of intercourse itself. A more sound analysis is to recognize that human nature will impel an unwilling woman to resist unlawful sexual intercourse with great effort if she is not disabled by any physical or mental incapacity at the moment, nor deterred by intimidation or deception. Hence the better view is that 'force' is not truly speaking an element of the crime itself, but if great force was not needed to accomplish the act the necessary *lack of consent* has been *disproved* in other than exceptional situations."

All courts recognize some exceptional situations where neither resistance nor force is required, e.g., when the victim is asleep. Clark and Marshall, *Crimes* § 11.01 at 673. Some other situations require little more in the way of either force or resistance as where a father or stepfather rapes his young daughter. *State v. Carter,* 265 N. C. 626, 144 S.E.2d 826 (1965) ; *Deffenbaugh v. State,* 257 P. 27 (Ariz. 1927) ; *Bailey v. Commonwealth,* 82 Va. 107 (1886). The question of statutory rape, where the victim is below the age of consent, was not involved in these cases.

Although a police officer does not stand *in loco parentis* to a person he has taken into his car, or even taken into custody, there is some analogy between the cases involving parents and those involving policemen since both the parent and the policeman are figures of authority; therefore, the force and resistance required under these exceptional circumstances is not great. Other cases involving police officers or threats to arrest provide some guidance as to the quantum of force necessary to allow proof of the necessary elements without physical resistance.

In *Davis v. Commonwealth,* 45 S.E.2d 167 (Va. 1947) two white police officers picked up a 32 year old black woman late at night and, after separating her from her male friend with whom she was having an argument on the street, threatened to arrest her for prostitution. The

officers directed her to get into the police car and drove her to a secluded area where each had sexual intercourse with her using only enough force to remove her underwear and to pry her legs open with their knees. Aside from the earlier threat to arrest, the only other threat was in answer to her pleadings they told her to shut up "if you know what is good for you." The Court held these facts sufficient to support a verdict.

In *People v. Cavanaugh*, 158 P. 1053 (Cal. Dist. Ct. App. 1916) the Court reversed because the trial judge had failed to grant an instruction that rape could not be found if it appeared that the prosecutrix's submission was brought about because of her belief the man was an officer and that he would arrest her if she did not submit. But in *People v. Cassandras*, 188 P. 2d 546 (Cal. Dist. Ct. App. 1948) it was pointed out that the *Cavanaugh* opinion showed the Court was most distrustful of the prosecutrix's story. *Cassandras* sustained a conviction based upon a threat to arrest by a private citizen plus little else:

> "The evidence shows that the prosecutrix was reluctant to enter the room and was 'pushed' into it by appellant; that appellant told her she was 'not going to get out of here until you undress and go to bed'; that 'you are not getting out'; that 'he told me to keep still if I didn't want to get hurt'; that the prosecutrix 'was scared he would hurt me. I didn't care about being hurt, I wanted to get home with my kids'; that she further testified 'I was scared * * * I didn't know what to do.' This evidence is reasonably susceptible of the interpretation that threats to do great bodily harm were made, and that the consent of the prosecutrix was secured as a result of such threats."

While we do not rule that a rape occurs when a victim yields solely because an officer threatens to arrest her, in the instant case the other circumstances in addition to

the threat of arrest are sufficient to support a verdict based upon the theory that the victim's lack of physical resistance resulted from having been put in fear. The lack of resistance here does not, therefore, prove either consent or lack of force. We cannot say the trial judge was clearly erroneous when he found:

"Now, examining the facts on the question of consent *vel non* in the light of that quotation taken from the *Hazel* case, did Margaret Propst consent to this act of intercourse, or did she merely submit due to being afraid, in fear of what might happen if she did not submit? She says she was afraid, she was scared. What else is there in the case to support her testimony? I was quite impressed with the testimony of Oliphant. He has worked with the Bethlehem Steel Company for seventeen years. He impresses me as being a decent citizen. He says that when the Defendant and Margaret Propst returned to his car, she didn't even want him to get the license number of the police car. She was afraid for him and for his safety. He told her that he was going to the police, and she said you'll get in trouble, the police will hurt you. She was crying; she was hysterical. When Sergeant Richard A. Lanham arrived at the Northern District station between 3:30 and 4:00 a.m., he said she was still somewhat upset. She refused to go into the Northern Station when she first got there. Counsel makes a point of the fact that when they asked the two people or groups of people for directions to the police station, she did not complain to them about having been raped. The last thing in her mind was complaining to them about this rape. I completely understand why she made no statement to them, and when she got to the police station, with the negro fear of police and of complaining to the

police, not about some outsider but one of their own, I can see where she was really afraid of the consequences, and only went in the police station when an officer came out and got her and asked her to come inside.

"It is my judgment that she was afraid, genuinely afraid, understandably afraid. The verdict is guilty under the first count."

The trial judge's discussion graphically shows the victim was in great fear. It is apparent the accused deliberately placed the victim in a situation where she would be afraid, with the expectation she would thereby yield to his lustful demands without physical resistance.

*Judgment affirmed.*
*Appellant to pay the costs.*