**Julio GONZALES, Appellant (Defendant below),**

v.

**STATE of Wyoming, Appellee (Plaintiff below).**

No. 4236.

Supreme Court of Wyoming.

Dec. 11, 1973.

William R. Thatch, Lovell, for appellant.

Clarence A. Brimmer, Atty. Gen., Jerome F. Statkus, Asst. Atty. Gen., Cheyenne, Robert A. Gish, Co. Atty., Basin, for appellee.

Before PARKER. C. J., and McEWAN, GUTHRIE, McINTYRE, and McCLINTOCK, JJ.

Mr. Justice GUTHRIE delivered the opinion of the court.

This appeal is prosecuted from the judgment and sentence of the trial court based upon a finding of guilt of the crime of first degree rape alleged to have been committed by the defendant upon Evelyn Marie Boelter, after 2 a. m. on October 1, 1972, in Big Horn County. Since the prosecutrix was the only witness who testified as to this actual occurrence her testimony must be examined fully to make a disposition of this case.

She was at the time 33 years old, the mother of three children, and had been divorced at the time of the occurrence. She was working at a bar in Byron, having had experience in such work.

Defendant had come into the bar shortly before closing and had been drinking. Prosecutrix had served him drinks and had rolled dice with him a couple of times "for the music" during this period. He had come to the bar with another man, who apparently had been drinking too much, and sometime prior to the time prosecutrix left the bar defendant asked her for a ride home. She advised him she did not take anyone home. When she left the bar to drive home defendant followed her and when she climbed into the driver's side of the car defendant went to the other side of the car and got in and repeated his re-

quest to be driven to Lovell. She again refused, although she said she was nervous and scared at the time and she made no further protest, nor did she seek help from the proprietor or any of the five other people in the bar and drove without stopping or signalling with the horn. On the way to Lovell defendant asked her what was wrong and inquired if she felt he was going to rape her or something. At a point approximately one mile from Lovell he told her to turn off on a side road, telling her his mother lived down the road. She stopped the car several times, asking to turn back, but he told her it was only a little way farther down the road. He asked her to stop "to go to the bathroom" and took the keys out of the ignition, telling her she would not drive off and leave him. She stayed in the car when he "went to the bathroom" and made no attempt to leave. When he returned he told her he was going to rape her and she kept trying to talk him out of it. He told her he was getting mad at her and then put his fist against her face and said, "I'm going to do it. You can have it one way or the other." She says he was mad because she was trying to talk him out of it, although there is no testimony as to exactly what was said or done during this period. After this threat he took off her shoes and when he said he'd take off her panties if she didn't, she took them off. Her clothes were in no manner torn and she did not know if her hair was mussed. She was in no manner bruised and, as she admits, she was never struck at any time. Sometime after turning off on the side road Kay Sigman, whom she knew and recognized, drove by, driving slowly. She did not honk or attempt to stop him or to attrack his attention. She does not remember whether Sigman passed before defendant "went to the bathroom" or after. Her testimony was that it was upon defendant's return that he made this threat. She knew defendant's temper and was scared of him because he had a quick temper. She had never taken a beating and did not want one. No other threats are mentioned. She says that it seemed like

two to three times he performed the sexual acts upon her but did not remember. During this time she kept begging him to let her go home. He replied he would let her go when he was through. At least two hours later she took him to his mother's and stopped at her own home to check on two of her sons and then went to Cowley to the home of Wanda Meeks where her other boy was staying and where she first made this complaint and was interviewed by the deputy sheriff. Prosecutrix had what might be described as a casual and friendly relationship with the defendant. He had given her a jewel box which he had made for her and they had attended parties together and apparently had danced together.

To sustain her knowledge of his quick temper and violence she testified about an incident wherein defendant was alleged to have threatened to beat her if he ever heard she was on dope. The court at the time this testimony was given stated that it had "no bearing whatsoever on the future threats," with which we are inclined to agree, suggesting that it might even indicate a concern for her welfare. Another incident to demonstrate her knowledge of his temper was a specific incident in the bar where she worked which involved two men and a "go-go girl." This girl solicited help from defendant and he tried to help her. It had appeared to prosecutrix there was going to be a fight and she walked over and ordered the two men to leave and asked defendant to sit down. So far as this incident is described in the record we must assume he did sit down because it was pursued no further and there was no evidence of violence. There is, then, a reference made to the fact that he did not like hippies and when one came into the bar he got "kind of mad." Additionally prosecutrix testified he had come into the bar on one occasion badly bruised and she said he told her he had been in a fight but no further particulars appear. There is no mention of violence in this connection. This is not a firm basis upon which to sketch a man of violence and one who

would inspire fear. It is further to be noted that Wanda Meeks, a close friend of prosecutrix who had known defendant eight to ten years, testified concerning several occasions when she had seen defendant and described him as acting like a gentleman and said he had never "said or did anything out of the way to me," nor had she seen him act in any manner hostile or violent toward the prosecutrix on any occasion when she had been present.

Defendant contends that the State failed to prove by substantial credible evidence that the intercourse occurred by force and against prosecutrix's will and there was not evidence to sustain a finding of non-consent and conviction.

■ We do not gainsay that resistance is not always necessary to establish lack of consent in a rape case and believe a correct statement appears in People v. Smith, 32 Ill.2d 88, 203 N.E.2d 879, 881, as follows:

"* * * However, resistance is not necessary under circumstances where resistance would be futile and would endanger the life of the female, nor where she is overcome by superior strength or paralyzed by fear. * * *"

This case was cited with approval and followed in People v. Lee, 96 Ill.App.2d 105, 238 N.E.2d 63, 66; and the same test was followed in People v. Taylor, 48 Ill.2d 91, 268 N.E.2d 865, 869.

■ The instant case was tried to the court with a jury waiver, and the court made a general finding of guilt under Rule 24(b), W.R.Cr.P. In the absence of a request for special findings it is our duty to examine the record to determine if there was substantial credible evidence sufficient to sustain the general finding, Reilly v. State, Wyo., 496 P.2d 899, 902, rehearing denied 498 P.2d 1236.

■ At the time of the finding of guilt the court said:

"We all know the law does not require a woman to fight to the utmost. All she is required to do is to resist until such time as she becomes convinced resistance is going to do her no good. She does not have to subject herself to a beating, knifing, or anything of that nature. As long as she is convinced something of a more serious nature will happen, she is then given by law the right to submit."

Wilson v. United States, 9 Cir., 250 F.2d 312, 324, rehearing denied 254 F.2d 391, equates such statement with erroneous jury instructions.

The trial judge having enunciated the standard which he was applying to the evidence in support of his general finding, there is cast upon us the burden of reviewing this theory or basis for such finding to determine if this was a proper standard of law to apply in reaching his verdict. This is applied in criminal cases and has been expressed as follows:

"* * * Where the trial judge applies an improper standard of law in reaching his verdict, as indicated by his remarks at the time, the appellate court can reverse despite the absence of special findings. * * *" 8 Moore's Federal Practice, § 23.05, p. 23–13 (2d Ed.).

See also Wilson v. United States, supra, 250 F.2d at 323–324, and United States v. Milton, 10 Cir., 421 F.2d 586, 587. Because of the circumstances, and because the evidence of the nature and sufficiency of the threat to justify nonresistance is far from overwhelming in this case, we deem it necessary to make an examination of the record to seek the basis of the court's general finding.

If this standard had been the basis of an instruction it would have been reversible error because it would place the determination solely in the judgment of the prosecutrix and omit the necessary element of a reasonable apprehension and reasonable ground for such fear; and the reasonableness must rest with the fact finder. An excellent statement of this appears in Farrar v. United States, 107 U.S.App.D.C. 204, 275 F.2d 868, 876:

"As I understand the law of rape, if no force is used and the girl in fact ac-

quiesces, the acquiescence may nevertheless be deemed to be non-consent if it is induced by fear; but the fear, to be sufficient for this purpose, must be based upon something of substance; and furthermore the fear must be of death or severe bodily harm. A girl cannot simply say, 'I was scared,' and thus transform an apparent consent into a legal non-consent which makes the man's act a capital offense. She must have a reasonable apprehension, as I understand the law, of something real; her fear must be not fanciful but substantial."

See also Cascio v. State, 147 Neb. 1075, 25 N.W.2d 897, 900; People v. Harris, 108 Cal.App.2d 84, 238 P.2d 158, 161; Satterwhite v. Commonwealth, 201 Va. 478, 111 S.E.2d 820, 823; and Winegan v. State, 10 Md.App. 196, 268 A.2d 585, 588.

Because of the reliance on this incorrect standard this general finding of guilt cannot stand. Under these circumstances we find it unnecessary to discuss whether there was sufficient substantial credible evidence offered by the State in this case to sustain a conviction. Inasmuch as the case must be retried in conformity with these principles we do not deem it amiss to state it is not entirely fair to a trial court or to the defendant to rely upon the sketchy showing and lack of detail presented at this trial. While delicacy may be socially proper, it cannot be defended when a man's liberty is at stake.

Reversed and remanded for new trial.