EDWARD S. RUSK *v.* STATE OF MARYLAND

[No. 1249, September Term, 1978.]

*Decided October 10, 1979.*

The cause was argued before MORTON, MOORE and LOWE, JJ., and reargued before GILBERT, C. J., and MORTON, THOMPSON, MOYLAN, MOORE, LOWE, MELVIN, MASON, LISS, WILNER, COUCH, MACDANIEL and WEANT, JJ.

Argued and reargued by *Ira C. Cooke,* with whom were *Melnicove, Kaufman & Winer, P.A.* on the brief, for appellant.

Argued and reargued by *Kathleen M. Sweeney, Assistant*

*Attorney General,* with whom were *Stephen H. Sachs, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *James Salkin, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court. WILNER, J., files a dissenting opinion, in which MORTON, MOYLAN, MOORE and MACDANIEL, JJ., join, at page 484 *infra.*

We are called upon to review the sufficiency of the evidence to convict for rape. Whatever the law may have been before, it is now clear that our standard must be: Is the evidence sufficient for a finder of fact to conclude that the accused was guilty beyond a reasonable doubt? *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). We hold that the evidence was not sufficient. In making this review we must look at the evidence in the light most favorable to the prosecution. *Jackson v. Virginia, supra; Brown v. State,* 29 Md. App. 1, 21, 349 A.2d 359, 371 (1975).

Edward Salvatore Rusk, the appellant, was convicted in the Criminal Court of Baltimore of rape in the second degree and of assault. He was sentenced to concurrent terms of ten years for the rape and five years for the assault. The appellant does not challenge the conviction for assault but only for the rape. We will, therefore, affirm the assault conviction.

The prosecutrix was a twenty-one year old mother of a two-year old son. She was separated from her husband but not yet divorced. Leaving her son with her mother, she attended a high school reunion after which she and a female friend, Terry, went bar hopping in the Fells Point area of Baltimore. They drove in separate cars. At the third bar the prosecutrix met appellant.

> "Terry and I were standing against the wall, and she was talking to some guy that I don't know who he was; and Eddie Rusk walked up. I didn't know who he was, at the time, and he said, hi to Terry; and Terry said, hi, Eddie; and Terry went back to her conversation, and he stood there talking to me."

They had a five or ten minute conversation in the bar; at the end of which the prosecutrix said she was ready to leave.

Appellant requested a ride home and she agreed. When they arrived at appellant's home, the prosecutrix parked at the curb on the side of the street opposite his rooming house but did not turn off the ignition. She put the car in park and appellant asked her to come up to his apartment. She refused. He continued to ask her to come up, and she testified she then became afraid. While trying to convince him that she didn't want to go to his apartment she mentioned that she was separated and if she did, it might cause her marital problems particularly if she were being followed by a detective. The appellant then took the keys out of the car and walked over to her side of the car, opened the door and said, "Now will you come up?" The prosecutrix then told him she would. She stated:

> "At that point, because I was scared, because he had my car keys. I didn't know what to do. I was someplace I didn't even know where I was. It was in the city. I didn't know whether to run. I really didn't think, at that point, what to do. Now, I know that I should have blown the horn. I should have run. There were a million things I could have done. I was scared, at that point, and I didn't do any of them."

The prosecutrix followed appellant into the rowhouse, up the stairs, and into the apartment. When they got into appellant's room, he said that he had to go to the bathroom and left the room for a few minutes. The prosecutrix made no attempt to leave. When appellant came back, he sat on the bed while she sat on the chair next to the bed. He turned the light off and asked her to get on the bed with him. He started to pull her onto the bed and also began to remove her blouse. She stated she took off her slacks and removed his clothing because "he asked [her] to do it." After they both undressed, prosecutrix stated:

> "I was still begging him to please let, you know, let me leave. I said, 'you can get a lot of other girls down there, for what you want,' and he just kept saying, 'no,' and then I was really scared, because I can't describe, you know, what was said. It was more the

look in his eyes; and I said, at that point — I didn't know what to say; and I said, 'If I do what you want, will you let me go without killing me?' Because I didn't know, at that point, what he was going to do; and I started to cry; and when I did, he put his hands on my throat, and started lightly to choke me; and I said, 'If I do what you want, will you let me go?' And he said, yes, and at that time, I proceeded to do what he wanted me to."

She stated that she performed oral sex and they then had sexual intercourse.[1]

The appellant testified as did two of his friends who were at the bar in which the parties met. Their testimony painted the episode in a manner more favorable to the accused, but there is no need for us to recite that testimony because, as we have stated earlier, we are obligated to view the evidence in the light most favorable to the prosecution.

The Court of Appeals of Maryland last spoke on the amount

---

1. If we could say at this point that there is enough evidence for a reasonable fact finder to say such *threat* of force is solely that which overcame her will to resist, the conduct of both following intercourse would belie that conclusion:

"Q. All right. Now, after the sexual intercourse came to a conclusion, what is the very next thing that took place?

A. I asked him if I could leave now, and he said, 'Yes;' and I got up and got dressed; and he got up and got dressed; and he walked me to my car, and asked if he could see me again; and I said, 'Yes;' and he asked me for my telephone number; and I said, 'No, I'll see you down Fell's Point sometime,' just so I could leave.

Q. What is the reason that you said that you would meet him the next day?

A. I didn't say the next day, and I just said I would see him down there only so I could leave. I didn't know what else to say. I had no intention of meeting him again."

After arriving home she said:

"I sat in the car, thinking about it a while, and I thought I wondered what would happen if I hadn't of done what he wanted me to do. So I thought the right thing to do was to go report it, and I went from there to Hillendale to find a police car."

If, in quiet contemplation after the act, she had to wonder what would have happened, her submission on the side of prudence seems hardly justified. Indeed, if *she* had to wonder afterward, how can a fact finder reasonably conclude that she was justifiably in fear sufficient to overcome her will to resist, at the time.

of force required to support a rape conviction in *Hazel v. State,* 221 Md. 464, 469, 157 A.2d 922, 925 (1960), when the Court said:

> "Force is an essential element of the crime and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force or that she was prevented from resisting by threats to her safety." [2]

In all of the victim's testimony we have been unable to see any resistance on her part to the sex acts and certainly can we see no fear as would overcome her attempt to resist or escape as required by *Hazel.* Possession of the keys by the accused may have deterred her vehicular escape but hardly a departure seeking help in the rooming house or in the street. We must say that "the way he looked" fails utterly to support the fear required by *Hazel.*

This Court has reviewed the question in a number of decisions since 1967, the most recent being *Goldberg v. State,* 41 Md. App. 58, 395 A.2d 1213, *cert. dismissed* as improvidently granted, September 18, 1979, in which we applied the *Hazel* rule and referred to our earlier cases applying the same rule:

> "As we said in *Winegan v. State,* 10 Md. App. 196, 200, 201, 268 A.2d 585 (1970):
>
> '...[W]here the victim's story could not be corroborated by wounds, bruises or disordered clothing, the lack of consent could be shown by fear based upon reasonable apprehension. The rule requiring the apprehension be reasonable

---

2. Since Hazel, the Maryland Legislature has codified extensively the law pertaining to sexual offenses providing in Md. Code, Art. 27, § 463 as follows:

> "(a) What constitutes. — A person is guilty of rape in the second degree if the person engages in vaginal intercourse with another person:
> (1) By force or threat of force against the will and without the consent of the other person...."

The statute has made no change in the force as required by Hazel.

was first enunciated in Maryland in *Hazel v. State,* 221 Md. 464, 469, 157 A. 2d 922:

"If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim — having regard to the circumstances in which she was placed — a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force."

'The rule of reason, as we shall call it, was reiterated, either expressly or impliedly, by us in *Walter v. State, supra,* [9 Md. App. 385, 264 A.2d 882 (1970)] and *Rice v. State, supra,* [9 Md. App. 552, 267 A.2d 261 (1970)]. It is expressly supported by several cases throughout the country. [Citations omitted]'." 41 Md. App. at 68-9.

Appellee argues first that the issue as to whether or not intercourse was accompanied by force or threats of force is one of credibility to be resolved by the triers of the fact. We cannot follow the argument. As we understand the law, the trial judge in ruling on a motion to acquit must first determine that there is legally sufficient evidence for the jury to find the victim was *reasonably* in fear. That is the rule set forth in *Hazel* and in each of our cases cited above. Contrary to the State's argument, there is no issue of credibility before us, because we accept the testimony that is most damaging to the accused before applying the rule. The State argues further that the evidence that the accused "started lightly to choke me" as well as the circumstances of being in a somewhat strange part of town late at night were sufficient to overcome the will of a normal twenty-one year old married woman. We are not impressed with the argument. When at oral argument it was pointed out to the State that the cases require that the fear must be reasonable, the appellee answered first that the cases so requiring were wrong and

should be overruled and secondly, that a rapist took his victim as he found her. Thus, the argument goes, even though the victim was unreasonable in being afraid, that was the chance a man took in having intercourse with someone not his wife. In other words, in any situation where the victim testified that she consented because she was afraid, the verdict of the jury would be conclusive and all such cases should be submitted to the jury for consideration. Whatever appeal this argument might have in other cases, it has none here where there is nothing whatsoever to indicate that the victim was anything but a normal, intelligent, twenty-one year old, vigorous female.

Cases from other jurisdictions have followed the rule that the victim's fear which overcomes her will to resist must be a reasonable fear. In *Farrar v. United States,* 275 F.2d 868 (D.C. Cir. 1959), *rehearing denied* 1960, the court found that the witness rested her claim of fear upon her belief appellant had a knife, yet she never saw the knife. The court stated:

> "As I understand the law of rape, if no force is used and the girl in fact acquiesces, the acquiescence may nevertheless be deemed to be non-consent if it is induced by fear; but the fear, to be sufficient for this purpose, must be based upon something of substance; and furthermore the fear must be of death or severe bodily harm. A girl cannot simply say, 'I was scared,' and thus transform an apparent consent into a legal non-consent which makes the man's act a capital offense. She must have a reasonable apprehension, as I understand the law, of something real; her fear must be not fanciful but substantial." (footnotes omitted). 275 F.2d at 876.

The rule that the apprehension must be reasonable was also recognized in *Gonzales v. State,* 516 P.2d 592 (Wyo. 1973). The facts in *Gonzales* are similar, but stronger than, the facts in the instant case. There, the defendant met the victim at the bar where she was working. He asked her for a ride home and she refused. When she got into the driver's side of her car, he got in the other side, but she did not protest. After driving

for awhile, he told her to turn off on a side road, telling her that his mother lived there. He asked her to stop, and then took the keys out of the ignition. He got out of the car to go to the bathroom. She stayed in the car and made no attempt to leave or to blow her horn. He said he was going to rape her and he put his fist in her face and said, "I'm going to do it. You can't have it one way or the other." She took off part of her own clothes. When someone she knew passed by in a car, she made no attempt to stop him. The trial judge found the defendant guilty of rape.

The Wyoming Supreme Court reversed, stating that the trial judge applied the wrong standard in reaching the verdict. The Court quoted the above passage from *Farrar v. United States, supra,* and held that the trial court omitted the necessary element of reasonable apprehension. *See also Tryon v. Wyoming,* 567 P.2d 290 (Wyo. 1977), in which the Wyoming Court found the evidence sufficient where a twelve year old girl was involved.

Other cases have also recognized the reasonable apprehension rule. *See, People v. Harris,* 108 Cal. App. 2d 84, 238 P.2d 158 (1951); *State v. Dill,* 3 Terry 533, 42 Del. 533, 40 A.2d 443 (Court of Oyer and Terminer, 1944); *Rush v. State,* 301 So. 2d 297 (Miss. 1974); *Cascio v. State,* 25 N.W.2d 897 (Neb. Sup. Ct. 1947); and *State v. Verdone,* 114 R.I. 613, 337 A.2d 804 (1975), *reargument denied,* 114 R.I. 961. Still other cases apply the rule without discussing the reasonableness of the fear. *Nelson v. Arkansas,* 262 Ark. 391, 557 S.W.2d 191 (1977); *People v. Taylor,* 48 Ill. 2d 91, 268 N.E.2d 865 (1971); and *O'Bryan v. Florida,* 324 So. 2d 713 (Fla. App. 1976). Indeed, we have found no case which did not expressly or impliedly recognize the doctrine that in the absence of force, the fear of the victim must be reasonable to support a rape conviction, except perhaps *Salsman v. Kentucky,* 565 S.W.2d 638 (Ky. App. 1978). In that case the court stated the fear should be judged on a subjective standard when the victim was retarded. The same result, however, could have been reached by applying the objective standard. It is not necessary to apply a subjective standard

in order to give weight to the mental condition or the age of the victim.

Applying this reasoning to the record before us, we find the evidence legally insufficient to warrant a conclusion that appellant's words or actions created in the mind of the victim a reasonable fear that if she resisted, he would have harmed her, or that faced with such resistance, he would have used force to overcome it. The prosecutrix stated that she was afraid, and submitted because of "the look in his eyes." After both were undressed and in the bed, and she pleaded to him that she wanted to leave, he started to lightly choke her. At oral argument it was brought out that the "lightly choking" could have been a heavy caress. We do not believe that "lightly choking" along with all the facts and circumstances in the case, were sufficient to cause a reasonable fear which overcame her ability to resist. In the absence of any other evidence showing force used by appellant, we find that the evidence was insufficient to convict appellant of rape.

> *Judgment on the rape conviction reversed.*
> *Judgment on the assault conviction affirmed.*
> *Appellant and the Mayor and City Council of Baltimore to divide the costs.*

*Wilner, J., dissenting:*

With the deepest respect for the generally superior wisdom of my colleagues who authored or endorsed the majority Opinion, but with the equally profound conviction that, in this case, they have made a serious mistake, I record this dissent.

The majority's error, in my judgment, is not in their exposition of the underlying principles of law that must govern this case, but rather in the manner that they have applied those principles. The majority have trampled upon the first principle of appellate restraint. Under the guise of judging the sufficiency of the evidence presented against appellant, they have tacitly — perhaps unwittingly, but

nonetheless effectively — substituted their own view of the evidence (and the inferences that may fairly be drawn from it) for that of the judge and jury. In so doing, they have not only improperly invaded the province allotted to those tribunals, but, at the same time, have perpetuated and given new life to myths about the crime of rape that have no place in our law today.

The principles of law that govern this proceeding are derived, in essence, from two cases. First, in judging whether the evidence was sufficient to support the conviction, which is the only question before us, the standard is, as the majority states, that established by the Supreme Court in *Jackson v. Virginia,* 99 S. Ct. 2781 (1979): whether there was enough evidence for the finder of fact to conclude that appellant was guilty beyond a reasonable doubt. We look, in making that determination, to the evidence most favorable to the state, which, in this case, derives almost entirely from the testimony of the victim. That evidence must then be compared with the legal requisites for the crime of second degree rape, the crime of which appellant was convicted.

Md. Annot. Code art. 27, § 463 (a) considers three types of conduct as constituting second degree rape. We are concerned only with the first: a person is guilty of rape in the second degree if he (1) engages in vaginal intercourse with another person, (2) by force or threat of force, (3) against the will, and (4) without the consent of the other person. There is no real question here as to the first, third, or fourth elements of the crime. The evidence was certainly sufficient to show that appellant had vaginal intercourse with the victim, and that such act was against her will and without her consent. The point at issue is whether it was accomplished by force or threat of force; and I think that in viewing the evidence, that point should remain ever clear. *Consent is not the issue here, only whether there was sufficient evidence of force or the threat of force.*

Unfortunately, courts, including in the present case a majority of this one, often tend to confuse these two elements — force and lack of consent — and to think of them as one. They are not. They mean, and require, different things. *See*

*State v. Studham,* 572 P.2d 700 (Utah, 1977). What seems to cause the confusion — what, indeed, has become a common denominator of both elements — is the notion that the victim must actively resist the attack upon her. If she fails to offer sufficient resistance (sufficient to the satisfaction of the judge), a court is entitled, or at least presumes the entitlement, to find that there was no force or threat of force, or that the act was not against her will, or that she actually consented to it, or some unarticulated combination or synthesis of these elements that leads to the ultimate conclusion that the victim was not raped. Thus it is that the focus is almost entirely on the extent of resistance — *the victim's acts, rather than those of her assailant.* Attention is directed not to the wrongful stimulus, but to the victim's reactions to it. Right or wrong, that seems to be the current state of the Maryland law; and, notwithstanding its uniqueness in the criminal law, and its illogic, until changed by statute or the Court of Appeals, I accept it as binding.

But what is required of a woman being attacked or in danger of attack? How much resistance must she offer? Where is that line to be drawn between requiring that she either risk serious physical harm, perhaps death, on the one hand, or be termed a willing partner on the other? Some answers were given in *Hazel v. State,* 221 Md. 464 (1960), although, as in so many cases, they were stated in the context of both the requirement of force and the lack of consent. The Court said, at pp. 469, 470:

> "Force is an essential element of the crime and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force or that she was prevented from resisting by threats to her safety. But no particular amount of force, either actual or constructive, is required to constitute rape. Necessarily that fact must depend upon the prevailing circumstances. As in this case force may exist without violence. *If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim — having regard to the*

*circumstances in which she was placed — a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force. . . .*

"With respect to the presence or absence of the element of consent, it is true, of course, that however reluctantly given, consent to the act at any time prior to penetration deprives the subsequent intercourse of its criminal character. *There is, however, a wide difference between consent and a submission to the act. Consent may involve submission, but submission does not necessarily imply consent. Furthermore, submission to a compelling force, or as a result of being put in fear, is not consent. . . .*

"The authorities are by no means in accord as to what degree of resistance is necessary to establish the absence of consent. However, the generally accepted doctrine seems to be that a female — who was conscious and possessed of her natural, mental and physical powers when the attack took place — must have resisted to the extent of her ability at the time, unless it appears that she was overcome by numbers or was so terrified by threats as to overpower her will to resist. . . . Since resistance is necessarily relative, the presence or absence of it must depend on the facts and circumstances in each case. . . . *But the real test, which must be recognized in all cases, is whether the assault was committed without the consent and against the will of the prosecuting witness.*

"The kind of fear which would render resistance by a woman unnecessary to support a conviction of rape includes, but is not necessarily limited to, a fear of death or serious bodily harm, or a fear so extreme as to preclude resistance, or a fear which would well nigh render her mind incapable of continuing to resist, or a fear that so overpowers her that she does not dare resist." (Citations omitted.) (Emphasis supplied.)

From these pronouncements in *Hazel,* this Court has articulated what the majority refers to as a "rule of reason" —*i.e.,* that "where the victim's story could not be corroborated by wounds, bruises or disordered clothing, the lack of consent could be shown by fear based upon reasonable apprehension." *Winegan v. State,* 10 Md. App. 196, 200 (1970); *Goldberg v. State,* 41 Md. App. 58 (1979). *As so phrased,* I do not consider this to be a rule of reason at all; it is highly unreasonable, and again mixes the element of consent with that of force. But what I do accept is what the Court of Appeals said in *Hazel:* (1) if the acts and threats of the defendant were reasonably calculated to create in the mind of the victim — having regard to the circumstances in which she was placed — a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force; (2) submission is not the equivalent of consent; and (3) the real test is whether the assault was committed without the consent and against the will of the prosecuting witness.[1]

Upon this basis, the evidence against appellant must be considered. Judge Thompson recounts most, but not quite all, of the victim's story. The victim — I'll call her Pat — attended a high school reunion. She had arranged to meet her girlfriend Terry there. The reunion was over at 9:00, and Terry asked Pat to accompany her to Fell's Point.[2] Pat had gone to Fell's Point with Terry on a few prior occasions, explaining in court: "I've never met anybody [there] I've gone out with. I met people in general, talking in conversation, most of the time people that Terry knew, not that I have gone down there, and met people as dates." She agreed to go, but first called her mother, who was babysitting with Pat's two-year old son, to tell her that she was going with Terry to Fell's Point, and that

---

1. Other courts have stated the rule this way: A rape victim is not required to do more than her age, strength, surrounding facts and all attending circumstances make it reasonable for her to do to manifest her opposition. *See* Dinkens v. State, 546 P.2d 228 (Nev. 1976); State v. Studham, 572 P.2d 700 (Utah 1977). *See also* Schrum v. Com., 246 S.E.2d 893 (Va. 1978).

2. Fell's Point is an old section of Baltimore City adjacent to the harbor. It has been extensively renovated as part of urban renewal and, among refurbished homes and shops, hosts a number of cafes and discotheques. It is part of the City's night scene.

she would not be home late. It was just after 9:00 when Pat and Terry, in their separate cars, left for Fell's Point, alone.[3]

They went to a place called Helen's and had one drink. They stayed an hour or so and then walked down to another place (where they had another drink), stayed about a half hour there, and went to a third place. Up to this point, Pat conversed only with Terry, and did not strike up any other acquaintanceships. Pat and Terry were standing against a wall when appellant came over and said hello to Terry, who was conversing with someone else at the time. Appellant then began to talk with Pat. They were both separated, they both had young children; and they spoke about those things. Pat said that she had been ready to leave when appellant came on the scene, and that she only talked with him for five or ten minutes. It was then about midnight. Pat had to get up with her baby in the morning and did not want to stay out late.

Terry wasn't ready to leave. As Pat was preparing to go, appellant asked if she would drop him off on her way home.[4] She agreed because she thought he was a friend of Terry's. She told him, however, as they walked to her car, "I'm just giving a ride home, you know, as a friend, not anything to be, you know, thought of other than a ride." He agreed to that condition.

Pat was completely unfamiliar with appellant's neighborhood. She had no idea where she was. When she pulled up to where appellant said he lived, she put the car in park, but left the engine running. She said to appellant, "Well, here, you know, you are home." Appellant then asked Pat to come up with him and she refused. He persisted in his request, as did she in her refusal. She told him that even if she wanted to come up, she dared not do so. She was separated and it might cause marital problems for her. Finally, he reached over, turned off the ignition, took her

---

3. Pat said that Terry and she lived at opposite ends of town and that Fell's Point was sort of midway between their respective homes.

4. Her testimony about this, on cross-examination, was: "I said I was leaving. I said, excuse me. It's nice meeting you; but I'm getting ready to leave; and he said, 'which way are you going;' and I told him; at that time, he said, 'Would you mind giving me a lift?' "

keys, got out of the car, came around to her side, opened the door, and said to her, "Now, will you come up?"

It was at this point that Pat followed appellant to his apartment, and it is at this point that the majority of this Court begins to substitute its judgment for that of the trial court and jury. We know nothing about Pat and appellant. We don't know how big they are, what they look like, what their life experiences have been. We don't know if appellant is larger or smaller than she, stronger or weaker. We don't know what the inflection was in his voice as he dangled her car keys in front of her. We can't tell whether this was in a jocular vein or a truly threatening one. We have no idea what his mannerisms were. The trial judge and the jury could discern some of these things, of course, because they could observe the two people in court and could listen to what they said and how they said it. But all we know is that, between midnight and 1:00 a.m., in a neighborhood that was strange to Pat, appellant took her car keys, demanded that she accompany him, and most assuredly implied that unless she did so, at the very least, she might be stranded.

Now, let us interrupt the tale for a minute and consider the situation. Pat did not honk the horn; she did not scream; she did not try to run away. Why, she was asked. "I was scared. I didn't think at the time what to do." Later, on cross-examination: "At that point, because I was scared, because he had my car keys. I didn't know what to do. I was someplace I didn't even know where I was. It was in the city. I didn't know whether to run. I really didn't think, at that point, what to do. Now, I know that I should have blown the horn. I should have run. There were a million things I could have done. I was scared, at that point, and I didn't do any of them." What, counsel asked, was she afraid of? "Him," she replied. What was she scared that he was going to do? "Rape me, but I didn't say that. It was the way he looked at me, and said, 'Come on up, come on up;' and when he took the keys, I knew that was wrong. I just didn't say, are you going to rape me."

So Pat accompanied appellant to his apartment. As Judge Thompson points out, appellant left her in his apartment for

a few minutes.[5] Although there was evidence of a telephone in the room, Pat said that, at the time, she didn't notice one. When appellant returned, he turned off the light and sat on the bed. Pat was in a chair. She testified: "I asked him if I could leave, that I wanted to go home, and I didn't want to come up. I said, 'Now, I came up. Can I go?' " Appellant, who, of course, still had her keys, said that he wanted her to stay. He told her to get on the bed with him, and, in fact, took her arms and pulled her on to the bed. He then started to undress her; he removed her blouse and bra and unzipped her pants. *At his direction,* she removed his clothes. She then said:

> "I was still begging him to please let, you know, let me leave. I said, 'you can get a lot of other girls down there, for what you want,' and he just kept saying, 'no;' and then I was really scared, because I can't describe, you know, what was said. It was more the look in his eyes; and I said, at that point — I didn't know what to say; and I said, 'If I do what you want, will you let me go without killing me?' Because I didn't know, at that point, what he was going to do; and I started to cry; and when I did, he put his hands on my throat, and started lightly to choke me; and I said, 'If I do what you want, will you let me go?' And he said, yes, and at that time, I proceeded to do what he wanted me to."

He "made me perform oral sex, and then sexual intercourse."

Following that:

> "I asked him if I could leave now, and he said, 'Yes;' and I got up and got dressed; and he got up and got dressed; and he walked me to my car, and asked if he could see me again; and I said, 'Yes;' and he asked me for my telephone number; and I said,

---

5. On direct examination, she twice said that he left the room "for a minute" after telling her to sit down. On cross-examination, she said she couldn't remember how long he was gone, but, at counsel's suggestion, said that it was not longer than five minutes.

492

'No, I'll see you down Fell's Point sometime,' just so I could leave." [6]

At this point, appellant returned her car keys and escorted her to her car. She then drove off:

"I stopped at a gas station, that I believe was Amoco or Exon (sic), and went to the ladies' room. From there I drove home. I don't know — I don't know if I rode around for a while or not; but I know I went home, pretty much straight home and pulled up and parked the car.

"I was just going to go home, and not say anything.

"Q Why?

"A *Because I didn't want to go through what I'm going through now.*

"Q What, in fact did you do then?

"A I sat in the car, thinking about it a while, and I thought I wondered what would happen if I hadn't of done what he wanted me to do. So I thought the right thing to do was to go report it, and I went from there to Hillendale to find a police car." (Emphasis supplied.)

How does the majority Opinion view these events? It starts by noting that Pat was a 21-year old mother who was separated from her husband but not yet divorced, as though that had some significance. To me, it has none, except perhaps (when coupled with the further characterization that Pat and Terry had gone "bar hopping") to indicate an underlying suspicion, for which there is absolutely no support in the record, that Pat was somehow "on the make". Even more alarming, and unwarranted, however, is the majority's analysis of Pat's initial reflections on whether to report what had happened. Ignoring completely her statement that she "didn't want to go through what I'm going through now", the

---

**6.** Pat explained this last comment further: "I didn't know what else to say. I had no intention of meeting him again."

majority, in footnote 1, cavalierly and without any foundation whatever, says:

> "If, in quiet contemplation after the act, she had to wonder what would have happened, her submission on the side of prudence seems hardly justified. Indeed, if *she* had to wonder afterward, how can a fact finder reasonably conclude that she was justifiably in fear sufficient to overcome her will to resist, at the time." (Emphasis in the original.)

It is this type of reasoning — if indeed "reasoning" is the right word for it — that is particularly distressing. The concern expressed by Pat, made even more real by the majority Opinion of this Court, is one that is common among rape victims, and largely accounts for the fact that most incidents of forcible rape go unreported by the victim. *See F.B.I. Uniform Crime Reports* (1978), p. 14; *Report of Task Force on Rape Control,* Baltimore County (1975); *The Treatment of Rape Victims In The Metropolitan Washington Area,* Metropolitan Washington Council of Governments (1976), p. 4. *See also Rape And Its Victims: A Report for Citizens, Health Facilities, and Criminal Justice Agencies,* LEAA (1975). If appellant had desired, and Pat had given, her wallet instead of her body, there would be no question about appellant's guilt of robbery. Taking the car keys under those circumstances would certainly have supplied the requisite threat of force or violence and negated the element of consent. No one would seriously contend that because she failed to raise a hue and cry she had consented to the theft of her money. Why then is such life-threatening action necessary when it is her personal dignity that is being stolen?

Rape has always been considered a most serious crime, one that traditionally carried the heaviest penalty. But until recently, it remained shrouded in the taboos and myths of a Victorian age, and little real attention was given to how rapes occur, how they may be prevented, and how a victim can best protect herself from injury when an attack appears inevitable. The courts are as responsible for this ignorance and the misunderstandings emanating from it as any other

institution in society, and it is high time that they recognize reality.

Rape is on the increase in the United States. The Uniform Crime Reports compiled by the F.B.I. show more than a doubling in both the absolute number of forcible rapes and in the rate per 100,000 population between 1965 and 1974. Between 1973 and 1977, forcible rape has increased 19%.[7] As the result of the Battelle Study,[8] we now know some things about this crime that we could only guess at before. Nearly half of the rapes occur when this one did, between 8:00 p.m. and 2:00 a.m., and, as in this case, approximately one-third of rape victims had come into contact with their assailants voluntarily, under circumstances other than hitchhiking.[9] *Physical force is absent in over half of reported cases and, in a third of the cases, no weapon is involved.* In rapes occurring in large cities (over 500,000 population), the statistics showed: [10]

| | |
|---|---|
| Use of physical force | 47.4% |
| Use of weapon: | |
| none | 34.6% |
| firearms | 21.1% |
| sharp instrument | 24.7% |
| blunt instrument | 7.3% |
| other | 11.6% |

Of particular significance is what was learned about *resistance.* The most common type of resistance offered by victims is *verbal.* Note: verbal resistance *is* resistance! In cases arising in the large cities, only 12.7% of the victims attempted flight, and only 12% offered physical resistance.[11] The reason for this is apparent from the next thing learned:

---

7. *See* FBI Uniform Crime Reports (1978), p. 14. *See also* Battelle Study, *infra,* note 8, Prosecutors' Volume I (1977), p. 7.

8. This was a study conducted by the Battelle Memorial Institute Law and Justice Study Center under grant from the LEAA (National Institute of Law Enforcement and Criminal Justice). The Report of the study was published during 1977 and 1978. I shall refer to it hereafter as "Battelle Study".

9. Battelle Study, Police Volume 1, p. 20.

10. *Id.,* p. 21. These figures, of course, are not cumulative. Weapons may accompany physical force, or there may be an absence of both.

11. *Id.,* p. 21.

that *"[r]ape victims who resisted were more likely to be injured than ones who did not."* [12] (Emphasis supplied.) The statistics showed, for rapes in large cities, that, where physical resistance was offered, over 71% of the victims were physically injured in some way, 40% requiring medical treatment or hospitalization.[13]

Said the Report: *"These results indicate one possible danger of the popular notion (and some statutory requirements) that a victim of an attack should resist to her utmost."* (Emphasis supplied.)

In a second volume of the Report, intended for prosecutors, some of the social attitudes about rape were discussed. With respect to resistance, it was noted (p. 4):

> "Perhaps because most women's experience and expertise with violence tends to be minimal, they are unlikely to engage in physical combat or succeed when they do. Many women employ what is referred to as 'passive resistance.' This can include crying, being slow to respond, feigning an inability to understand instructions or telling the rapist they are pregnant, diseased or injured. *While these techniques may not always be successful, their use does suggest that the victim is surely not a willing partner.*" (Emphasis supplied.)

In contrast to some of the inferences sought to be drawn by the majority from Pat's reactions, the Report further points out (Prosecutor's Volume I, p. 5):

> "Rather than expressing their emotions, some victims respond to a rape with a calm, composed demeanor or 'controlled reaction.' [Footnote omitted.] These victims do not wish to exhibit emotions, especially in front of a stranger or authority figure like the prosecutor. Psychologically it is important for these victims to demonstrate that they can handle stress in a mature and adult manner.

---

12. *Id.,* p. 22.
13. *Id.,* p. 22.

*The appearance of casualness hides and may avoid true and often intense emotions.* This 'control' may result in victim responses which are considered inappropriate such as giggling, smiling or even laughing. *Unfortunately this type of response can cause others to doubt the victim's account of the rape."* (Emphasis supplied.)

Finally, perhaps in response to the oft-quoted comment of Matthew Hale that still pervades societal thinking about rape ("[Rape] is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent"),[14] the Report observes (Vol. II, p. 4):

*"On a national average, 15 percent of all forcible rapes reported to the police were 'determined by investigation' to be unfounded. Given the inherent skepticism of many criminal justice personnel to rape victims and the harassment and invasion of privacy that a reporting victim is likely to confront, it is doubtful that many false accusations proceed past the initial report.* Curtis (1974) asserts that 'contrary to widespread opinion, there is in fact little hard empirical evidence that victims in rape lie more than, say victims in robbery.' Undoubtedly, there are false reports. However, the danger posed by the myth that women 'cry rape' is that police officers and prosecutors will believe it and then place the burden on the victims to prove the contrary." (Emphasis supplied.)

Law enforcement agencies throughout the country warn women not to resist an attack haphazardly, not to antagonize a potential attacker, but to protect themselves from more serious injury. The United States Department of Justice, for example, has published a pamphlet warning, among other things: [15]

---

14. 1 Hale, *The History of the Pleas of the Crown* 635 (1847).

15. *Be on the safe side,* LEAA, U.S. Department of Justice. The pamphlet also advises: "Be selective about new acquaintances; don't *invite* a forcible sexual encounter." *See also Let Prevention Be Your Guide,* a pamphlet

"If you are confronted by a rapist, stay calm and maximize your chances for escape. *Think* through what you will do.

You should not *immediately* try to fight back. Chances are, your attacker has the advantage. Try to stay calm and take stock of the situation."

Where does this leave us but where we started? A judge and a jury, observing the witnesses and hearing their testimony, concluded without dissent that there was sufficient evidence to find beyond a reasonable doubt that appellant had sexual intercourse with Pat by force or threat of force against her will and without her consent; in other words, that the extent of her resistance and the reasons for her failure to resist further were reasonable. No claim is made here that the jury was misinstructed on the law of rape. Yet a majority of this Court, without the ability to see and hear the witnesses, has simply concluded that, in *their* judgment, Pat's fear was not a reasonable one, or that there was no fear at all (a point that appellant conceded at oral argument before the Court *en banc*). In so doing, they have ignored the fact of a young woman alone in a strange neighborhood at 1:00 in the morning with a man who had taken her keys and was standing at her open car door demanding that she come with him; they have ignored that she offered the very type of verbal resistance that is prudent, common, and recommended by law enforcement agencies; they have ignored that the reasonableness of Pat's apprehension is inherently a question of fact for the jury to determine, *Tryon v. State,* 567 P.2d 290 (Wyo. 1977); *State v. Baldwin,* 571 S.W.2d 236 (Mo. 1978); *People v. Merritt,* 381

published by the (Baltimore City) Mayor's Coordinating Council on Criminal Justice; *Rape Prevention,* a pamphlet distributed by the Prince George's County Police Department. That pamphlet specifically warns:

"Extensive research into thousands of rape cases indicates that attempts at self defense, such as screaming, kicking, scratching and use of tear gas devices and other weapons, usually have provoked the rapist into inflicting severe bodily harm on the victim. Since it is unlikely you will be able to overcome the rapist by force, you must think about what he will do after you try and fail. Before you do anything, remember ... IF WHATEVER YOU DO DOES NOT HELP YOU, MAKE SURE THAT IT WILL NOT HARM YOU."

N.E.2d 407 (Ill. App. 1978); *People v. Vicaretti,* 388 N.Y.S.2d 410 (1976); *People v. Coleman,* 89 Cal. App. 3d 312 (1979).[16] Brushing all of this aside, they have countermanded the judgment of the trial court and jury and declared Pat to have been, in effect, an adulteress.[17]

I close with this comment taken from 13 Western Australian Law Rev. at 75 (1977), written half a world away, but precisely for this case:

> "Courts have sought to enunciate legal standards for consent with respect to allegations of rape, rather than leaving the issue as a question of fact for the jury. Thus, judges have intruded into an area which in terms of the common law definition of rape should be dealt with by the jury. This appears to suggest that juries are incompetent to do their job, that is, to review the facts as impartially as possible, and to make findings beyond a reasonable doubt without being led astray by prejudices or irrelevancies. The jury is indispensable to the common law justice system. If rape is defined as 'carnal knowledge of a woman without her consent', then it makes nonsense of the proposition that the jury is the trier of fact if the judge takes it upon himself to tell the jury what is or is not consent.

> "If the purpose of the law is to protect women from acts of sexual intercourse to which they have not in fact consented, whether by reason of force actually applied, physical or other threat, or fear induced by accused or by others, then the relevant question would appear to be: Did this particular

---

**16.** The majority Opinion cites and reviews at some length Gonzales v. State, 516 P.2d 592 (Wyo. 1973). It is worthy of note that the conviction in *Gonzales* was reversed not because of an insufficiency of evidence, but because of an erroneous jury instruction. The Wyoming court made this clear in *Tryon,* 567 P.2d at 292. Indeed, the *Gonzales* court held that the question of whether the victim's apprehension was reasonable was for the jury to determine. *See* 516 P.2d at 594.

**17.** Interestingly, appellant was convicted of assault arising out of the same incident, but did not contest the sufficiency of the evidence supporting that conviction. It would seem that if there was not enough evidence of force, or lack of consent, to permit the rape conviction, there was an equal insufficiency to support the assault conviction. The majority is spared, *in this case,* the need to deal with that thorny dilemma.

woman, in these particular circumstances, submit to this particular man; or did she in fact freely consent to have intercourse with him? If, on the contrary, the law requires a woman to react in a particular way, that is, by fighting back against her attacker and sustaining a certain degree of damage inflicted by the accused in order to signify the lack of consent, and if the law deems the woman to have consented to the act despite ample evidence of threats which rendered her submissive but non-consenting, then the law cannot be said to be serving its true function of protecting individuals from the imposition of non-consensual sexual intercourse.

"Whether the relevant threats do or do not measure up to standards which appear to be set in current rape cases — that the threat be immediate, physical, violent, interpreted on a reasonable-man standard — the accused is amply protected. He cannot be convicted unless the prosecution has proved beyond a reasonable doubt the requisite state of mind: that he intended to have intercourse with the woman without her consent, and did so; or that he was reckless thereto. By imposing an artificial standard of consent, by requiring the woman concerned to resist or at least not simply to suffer the imposition of the act as a lesser evil, the criminal law would seem to require a measure of 'self-help' which it does not require in any other area of criminal law — and indeed which is usually frowned upon by the law."

I am authorized to state that Judges Morton, Moylan, Moore and MacDaniel join in the views expressed herein.